**STANDARD FIRE INSURANCE COM-
PANY, Appellant,**

v.

**UNITED STATES of America,
Appellee.**

No. 25590.

United States Court of Appeals
Fifth Circuit.

Feb. 3, 1969.

Rehearing and Rehearing En Banc
Denied March 14, 1969.

**1296**

Alfred W. Offer, Carl Wright Johnson, San Antonio, Tex., for appellant.

Ted Butler, Asst. U. S. Atty., Ernest Morgan, U. S. Atty., San Antonio, Tex., for appellee.

Before GEWIN, PHILLIPS* and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

We review the rights and impediments to the cancellation of a fire insurance policy by the insuring company vis a vis the mortgagee of the insured property. We hold, as did the trial court, that the cancellation was ineffective and we affirm.

I.

In September, 1963, arrangements were perfected between Schroeder Enter-

prises, Main Bank & Trust Company (Main Bank), and the Small Business Administration (SBA) for a $30,000 loan to be made by Main Bank and the SBA to Schroeder Enterprises. The SBA's participation in the loan was to be 75% and Main Bank's was to be 25%. In accordance with these arrangements, a note in the face amount of $30,000 was executed and delivered to Main Bank on September 30, 1963. The face of this note evidenced the SBA's participation, and provided that Schroeder Enterprises would maintain insurance coverage for the holder of the note. The note was secured by a chattel mortgage on certain machinery and equipment of Schroeder Enterprises.

On July 1, 1963, prior to the execution of the note, Standard Fire Insurance Company (Standard) issued and delivered to Schroeder Enterprises a fire insurance policy covering the furniture, fixtures, and equipment in the one story building occupied by Schroeder Enterprises in San Antonio, Texas. The face of the policy showed the total insurance coverage to be $35,000 and bore an expiration date of July 1, 1966.

On September 26, 1963, a rider containing the following loss payable clause in favor of Main Bank was attached to the policy:

"Insured *Alfred Schroeder, George Schroeder and Bernard Pewitt dba SCHROEDER ENTERPRISES*

It is agreed that any loss or damage ascertained and proven to be *due to the insured* under this policy shall be held payable to *Main Bank and Trust, P. O. Box 1120, San Antonio, Texas,* as interest may appear; subject, however, to all terms and conditions of this policy, which are made a part hereof."

On November 2, 1964, the note and chattel mortgage were transferred to the SBA by Main Bank, and on the following day Main Bank advised Standard's agent in writing that the loss payable clause should be changed so as to designate the

* Judge Harry Phillips of the Sixth Circuit sitting by designation.

SBA as the loss payee. On the same day that it received notice of the transfer, Standard *orally* notified the SBA that the policy was being cancelled for non-payment of premiums. On November 19, the policy was cancelled for nonpayment of premiums, and a pro rata refund was given with the date of cancellation designated as November 9, 1964.[1] On December 4, 1964, the insurance company's agent sent to Schroeder Enterprises an invoice in connection with the policy in question, showing that the policy had been cancelled and showing the pro rata refund credit. This was followed on December 25, 1964, with a statement to Schroeder Enterprises showing each of the various policies that had been cancelled, including the policy in question, and showing the pro rata refunds and credits on each of such policies. No written notice of the cancellation was sent to either Main Bank or the SBA.

On January 28, 1965, a fire destroyed the property covered by the policy in question, and a claim on the proceeds was made by the SBA. When Standard refused to pay the claim on the ground that the policy had been cancelled, the SBA brought this suit in the district court and was awarded the sum of $24,783.95. The district court found that Standard had effectively cancelled the policy as to Schroeder Enterprises,[2] but that such action was not effective as to the SBA because of Article 6.15 of the Texas Insurance Code, V.A.T.S.[3]

The appeal to this court by Standard presents basically two issues; (1) wheth-er in view of Article 6.15 of the Texas Insurance Code an insurance company may cancel a fire insurance policy as to the interest of a mortgagee (SBA) without giving reasonable notice of the impending cancellation to that mortgagee, even though written notice of the intended cancellation is given to the named insured (Schroeder Enterprises); (2) whether *oral* notice to the mortgagee constitutes reasonable notice for the purposes of Article 6.15. We hold that Article 6.15 requires reasonable notice to the mortgagee and that this requirement is not satisfied by the giving of oral notice.

II.

Standard argues that under the provisions of the insurance contract it could cancel the policy without giving notice of its intention to cancel to either the SBA or Main Bank because neither had any interest or rights in the policy. This argument is premised upon the assumption that the policy contained an "*open* loss payable clause" which permitted cancellation without advance notice to either of the above named parties. See Atlas Reduction Co. v. New Zealand Ins. Co., 8 Cir. 1905, 138 F. 497. The concept of the "*open* loss payable clause" (as contrasted with the now more common "Union Mortgage Clause") is discussed in 5 Appleman, Insurance Law and Practice § 3401 at pp. 554–556 (1941) as follows:

"There are several different types of common loss payable or mortgage clauses. The open loss payable clause simply states that 'loss, if any, is payable to B, as his interest shall appear'

1. It is not disputed that Standard had a right to cancel the policy as far as the interest of Schroeder Enterprises is concerned. Schroeder Enterprises failed to make the first installment payment on the note it had given to pay for the policy in question. The installment premium note, dated July 1, 1963, had its first installment of $222.31 due on July 1, 1964, and such premium installment was never paid.

2. Nathan Nevelow, Trustee in Bankruptcy for the Estate of Schroeder Enterprises, intervened as a plaintiff below. He recovered nothing under the judgment of the district court, and has not appealed.

3. 14 Tex.Rev.Civ.Stat.Ann. art. 6.15 (1963):
 The interest of a mortgagee or trustee under any fire insurance contract hereafter issued covering any property situated in this State shall not be invalidated by any act or neglect of the mortgagor or owner of said described property or the happening of any condition beyond his control, and any stipulation in any contract in conflict herewith shall be null and void.

or uses other equivalent words, merely identifying the person who may collect the proceeds. However, there is another type variously known as the New York, standard, or union form which contains a somewhat similar expression, and then goes on to state that 'this insurance, as to the interest of the mortgagee only, shall not be invalidated by any act or neglect of the mortgagor or the owner of the within described property, nor by any foreclosure or other proceedings, or notice of sale relating to the property, nor by any change in the title or ownership or [sic] the property, nor by the occupation of the premsies for purposes more hazardous than are permitted by this policy, provided, that in case the mortgagor or owner shall neglect to pay any premium due under this policy, the mortgagee shall, on demand, pay the same.'

"Not all such wordings are identical, but it will be seen that the open loss payable clause is distinctly different from the latter forms. Only by explaining this difference now can confusion be avoided later, as entirely different results obtain under the two different forms. In the union, standard, or New York forms, the mortgagee may become liable to pay the premium to the insurer—in return, it is freed from policy defenses which the company may have against the mortgagor. In the open form, the mortgagee stands in the mortgagor's shoes, and is usually considered subject to the same defenses.

"From the point of view of legal interpretation, it has been held that a mortgagee under an open clause is an appointee only to receive the funds payable in the event of loss; it is not an assignment of the contract, but an appointment only.

* * * * * *

"Under a standard mortgage clause, the result has been that the courts have held that the agreement of the company with the mortgagee being separate and divisible from that with the mortgagor, the mortgagee cannot be affected by any act or default of the mortgagor, and any breach of the policy terms and conditions committed by the mortgagor is no defense to an action by the mortgagee. * * *

* * * * * *

"A distinction which is rather important to grasp is that the policy terms are themselves not nullified by a standard mortgage clause. It is, rather, that a new contract containing those provisions is made with the mortgagee personally; and the mortgagee is not bound by the mortgagor's contract which, while it may be identical in language, may be breached by the mortgagor's act. In other words, the indemnity of the mortgagee is not placed at the whim of his debtor, and is subject only to breaches of which the mortgagee is, himself, guilty. It has been properly stated that in some instances, certain of the provisions of the fire policy are modified and, under certain conditions, even omitted by the new agreement which springs from the mortgage clause and the insurance policy."

 Standard contends that by using the words "as interest may appear" in the loss payable clause, it was able to create "an *open* loss payable clause" which, as noted *supra* by Appleman, would permit cancellation without notice to any mortgagee.[4] Standard's interpretation of the policy language is in accord with the law in Texas prior to the enactment in 1919 of Tex.Rev.Civ.Stat. art. 4931, the predecessor of Article 6.15 of the Insurance Code. See Hamburg-Bremen Fire Ins. Co. v. Ruddell, 1904, 37

---

4. The words "as interest may appear" are found in the loss payable clause after the designation of Main Bank as the recipient of the policy proceeds in the event that the insured property was destroyed by fire. The entire clause is quoted *supra* in the text.

Tex.Civ.App. 30, 82 S.W. 826 (no writ). Article 6.15, which we must construe as part of the policy mosaic, reads as follows:

> "The interest of a mortgagee or trustee under any fire insurance contract hereafter issued covering any property situated in this State shall not be invalidated by any act or neglect of the mortgagor or owner of said described property or the happening of any condition beyond its control, and any stipulation in any contract in conflict herewith shall be null and void." [5]

The purpose and effect of Article 6.15 is to protect mortgagees from mortgagor derelictions with respect to insurance policies on mortgaged property, and thereby to permit mortgagees peace of mind as to the subsistence.of insurance coverage on their collateral. Article 6.15 became part of Standard's fire insurance policy as though it were printed there in haec verba. Accordingly, Standard could not cancel this fire insurance policy as to the interest of either the SBA or Main Bank because of the failure of Schroeder Enterprises to make timely payments on the premium note, at least not without giving reasonable notice to the mortgagees of its intention to cancel the policies. Citizens State Bank v. American Fire and Casualty Co., 5 Cir. 1952, 198 F.2d 57, 60; Rio Grande Nat. Life Ins. Co. v. Hardware Dealers Mut. Fire Ins. Co., Tex.Civ.App.1948, 209 S.W.2d 654 (writ ref'd n. r. e.); Feldman v. Costa, Tex.Civ.App.1943, 171 S.W.2d 200, 202 (writ ref'd w. o. m.). The rationale for this result was explained by the Supreme Court of Texas in Camden Fire Ins. Ass'n v. Harold E. Clayton & Co., 1928, 117 Tex. 414, 6 S.W.2d 1029, 1030, as follows:

> "The terms of the statute involved are so plain that there can be no doubt whatever that its purpose was to protect the holder of the mortgage, to whom the policy was made payable under the loss payable clause, from *'any act or neglect of the mortgagor.'*

5. Contrary to the assertions of Standard, both the SBA and Main Bank were mortgagees whose rights were protected by Article 6.15. See Johnson v. Robinson, 1887, 68 Tex. 399, 4 S.W. 625; R. F. Ball Construction Co. v. Jacobs, W.D. Tex.1956, 140 F.Supp. 60, 64; aff'd 5 Cir. 1956, 239 F.2d 384, rev'd on other grounds sub nom. United States v. Ball Construction Co., 1958, 355 U.S. 587, 78 S.Ct. 442, 2 L.Ed.2d 510; cf. Aetna Ins. Co. v. C. I. T. Corp., 5 Cir. 1934, 74 F.2d 516. Both the SBA and Main Bank had received a pledge of the insured property as security for a loan, and thus they had the status of mortgagees entitled to the protection of Article 6.15 with respect to the insured property even though they were not so designated on the face of the policy. The Code makes no fetish of nomenclature; rather it depersonalizes mortgagee interests because the economics of mortgage banking so requires. In today's market place, expansive marketability of mortgage paper is an economic fact which requires fluidity and easy transferability along with insurance protection running with the mortgage paper. Thus Article 6.15 speaks of a mortgagee, *not* of a *named* mortgagee; and its enunciative words have no qualification requiring that the protected mortgagee be mentioned either by name or by status. Conse-

quently, the anonymity of these mortgagees does not destroy their Article 6.15 rights. Cf. Boston Ins. Co. v. Rainwater, Tex.Civ.App.1946, 197 S.W.2d 118 (no writ); Superior Fire Ins. Co. v. Leal, Tex.Civ.App.1934, 73 S.W.2d 584 (writ dismissed).

Furthermore, both the SBA and Main Bank had their mortgagee status at all material times. Although the mortgage in question was transferred to the SBA subsequent to the issuance of the policy, the SBA was at all relevant times the beneficial owner of 75% of the mortgage and Main Bank was at all relevant times the beneficial owner of 25% of same. When the mortgage was transferred from Main Bank to the SBA, there was no change in beneficial ownership—the only change was in who was to service the loan. Cf. Small Business Administration v. McClellan, 1960, 364 U.S. 446, 81 S.Ct. 191, 5 L.Ed.2d 200. Certainly this transfer did not constitute an assignment of the policy or of the insured property in contravention of any policy clauses prohibiting such assignments without company approval. See Firemen's Fund Ins. Co. v. Galloway, Tex.Civ.App.1926, 281 S.W. 283, 286 (no writ); Scottish-Union & National Ins. Co. v. Andrews & Matthews, 1905, 40 Tex.Civ.App. 184, 89 S.W. 419, 422 (writ ref'd).

Since the taking of additional insurance which might otherwise have invalidated the policy was an act of the mortgagor prohibited by the statute, it follows that the policy is not invalid, in so far as the mortgagee, Harold E. Clayton & Co., is concerned.

"The statute in question, in its final analysis, is largely a legislative adoption of the meaning given what has sometimes been called the 'Union Mortgage Clause' by the courts of the country. This clause, among other things, ordinarily provides that the loss, if any, shall be payable to the mortgagee as his interest shall appear, and, further, that the insurance as to the interest of the mortgagee only therein shall not be invalidated by any *act or neglect of the mortgagor* or owner of the property. The effect of this clause, when attached to the policy, is to make a new and independent contract between the mortgagee and the insurer, and to effect a separate insurance on the mortgagee's interest. Being a separate insurance of the mortgagee's interest, its validity is dependent solely on the acts of the mortgagee, and is not affected by any act or neglect of the mortgagor in violation of the conditions of the policy of which the mortgagee is ignorant. [Authorities cited].

"A reading of the authorities cited will plainly show that the statute involved is in effect a legislative adoption of the interpretation placed upon the 'Union Mortgage Clause' by the courts of the country, and we see no reason why we should give that statute a construction more restrictive of the rights of the mortgagee than have the courts, where it was merely a part of the agreed contract. In fact, the statute as it exists was a part of the contract in this instance, since statutes governing the creation of contracts of this character are to be regarded as parts of the contracts themselves. [Authorities cited]."

## III.

We now come to the question of whether under Article 6.15 Standard could effectively cancel the policy as to the SBA by merely giving *oral* notice to the SBA of its intention prior to cancellation. Although the statute does not specify *any* circumstances under which a policy may be cancelled as to a mortgagee's interest because of a mortgagor fault, we will assume without deciding that the Texas courts would interpret Article 6.15 to permit such cancellation if the mortgagee had been given reasonable notice prior thereto. Under the circumstances of this case, however, oral notice is not reasonable notice.

If we held otherwise and permitted Standard to escape its mortgagee responsibilities by a mere oral communication of its intention to cancel, we would be undermining the unequivocal statutory protection accorded to mortgagees. We would also frustrate the very purpose of notice, which is to engender responsive options. In today's world of large financial institutions and government agencies, intelligent choices can be made by the entity to be charged with notice only when such notice is channeled to its responsible authorities. Written notice makes for documentary certainty as to time and content. Thus it is reasonable to charge mortgagees with having procedures by which they can properly funnel and act upon written notice. In contrast, the danger is great that oral notice would be given to minions of unascertained status in government agencies and corporate institutions, and would pass no further. We conclude, therefore, that the assurance of mortgagee security has been given too much statutory priority to be subjected to something so impermanent as the spoken word.

This conclusion follows logically from an examination of the Union Mortgage Clause which the *Camden* case, *supra,* held had in effect been written into every Texas fire insurance policy by Article 6.15. Such clause generally permits cancellation only after the giving of rea-

sonable written notice to the mortgagees. For example, the Union Mortgage Clause appearing in the uniform policy approved by the State Insurance Board [6] provides that the policy may be cancelled as to the interest of a mortgagee by giving him *ten days written* notice.[7] The promulgation of this clause indicates that the State Insurance Board has not sanctioned *oral* notice of cancellation, and we should not be more free in reading oral cancellation privileges into the statute than the Board charged with the administration of the statute has been.[8]

■ We hold that the insurance policy in question was not effectively cancelled as to the interest of the SBA and Main Bank. Thus the SBA and Main Bank are entitled to share in the proceeds in proportion to their respective interests in the insured property.[9] The

6. In Texas the State Insurance Board prescribes the content of fire insurance clauses pursuant to Article 5.35 of the Insurance Code, which provides as follows:

"The Board shall make, promulgate and establish uniform policies of insurance applicable to the various risks of this State, copies of which uniform policies shall be furnished each company now or hereafter doing business in this State. After such uniform policies shall have been established and promulgated and furnished the respective companies doing business in this State, such companies shall, within sixty (60) days after the receipt of such forms of policies, adopt and use said form or forms and no other; also all companies which may commence business in this State after the adoption and promulgation of such forms of policies, shall adopt and use the same and no other forms of policies."

7. Under this clause it has been held that an attempted cancellation was ineffective as to a mortgagee's interest because *written* notice was not given to the mortgagee. American Ins. Co. v. First Savings & Loan Ass'n., Tex.Civ.App.1968, 434 S.W. 2d 170.

The approved Union Mortgage Clause speaks of a named mortgagee being entitled to written notice and makes no mention of an unnamed mortgagee. This, however, does not mean that a named mortgagee is entitled to better notice than an anonymous mortgagee as neither the statute nor our jurisprudence has nominative requirements.

8. As no written notice was given to *either* the SBA or Main Bank, we are not called upon to decide whether the policy would have been effectively cancelled as to the interest of the SBA if Main Bank (whose name alone appears in the loss payable clause) had been given adequate written notice. Such written notice would probably be sufficient to permit cancellation as to the interest of Main Bank, but it

is doubtful whether it would be effective as to the SBA. This is because Article 6.15 appears to give named and unnamed mortgagees equal protection and equal rights to notice.

9. The mortgage agreement obligated Schroeder Enterprises to procure and maintain fire insurance on the specified collateral. When the fire insurance policy matured into proceeds after the collateral was destroyed by fire, such proceeds became encumbered with an equitable lien in favor of the SBA and Main Bank to the extent of their respective interests in the insured property. In Fidelity & Guaranty Ins. Corp. v. Super-Cold Southwest Co., Tex. Civ.App.1949, 225 S.W.2d 924, 927 (writ ref'd n.r.e), we read:

"* * * It has been held many times by the courts of this state and practically every other state in this country that an agreement between a mortgagor and a mortgagee under which the mortgagor is charged with the duty of procuring insurance upon the mortgaged property for the benefit of the mortgagee, will encumber the proceeds of any insurance so procured by the mortgagor with a lien in favor of the mortgagee. In such cases it is the duty of the mortgagor to have a provision inserted in the policy that the proceeds shall be payable to the mortgagee as his interest might appear but, where he fails to do so, equity will treat the policy as having contained such a provision upon the principle that equity treats that as done which should have been done. Of course, if the insurer is not informed of such an agreement, it is not bound thereby, but after the information is given to it, the duty rests upon the insurer to treat the proceeds of the policy as though such a provision was written into the policy. [Cases cited]."

See also Continental Insurance Co. v. Stewart & Stevenson Services, Tex.Civ. App., 1957, 306 S.W.2d 415, 420 (writ ref'd n.r.e.); Kirkpatrick v. Great American Insurance Co., Tex.Civ.App.1927, 299 S.W. 943, 945 (no writ).

judgment of the district court is therefore

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

### PER CURIAM:

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc, (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12) the Petition for Rehearing En Banc is denied.