**NATIONWIDE MUTUAL FIRE INSURANCE COMPANY,**
Plaintiff-Appellee,

v.

**Harold DUNGAN and Bobbie Dungan, United States of America, Farmer's Home Administration, Defendants-Appellants.**

No. 86–4266.

United States Court of Appeals,
Fifth Circuit.

June 15, 1987.

John Arthur Eaves, Pshon Barrett, Asst. U.S. Atty., Eaves & Eaves, George Phillips, U.S. Atty., Jackson, Miss., for defendants-appellants.

James L. Carroll, Rebecca Lee Wiggs, Watkins & Eager, Jackson, Miss., for plaintiff-appellee.

Before WISDOM, WILLIAMS, and HILL, Circuit Judges.

ROBERT MADDEN HILL, Circuit Judge:

Nationwide Mutual Fire Insurance Company (Nationwide) filed this action pursuant to 28 U.S.C. §§ 2201 and 2202 seeking a declaratory judgment concerning whether it was liable on a homeowner's insurance policy issued by it to Harold and Bobbie Dungan. The Dungans counterclaimed alleging breach of contract and bad faith refusal by Nationwide to pay benefits under the homeowner's policy. The United States, on behalf of Farmer's Home Administration (FmHA), intervened seeking a declaratory judgment that it was entitled to recover the proceeds of the policy by virtue of its priority lien on the Dungans' home, notwithstanding any defenses Nationwide may be able to assert against the Dungans. The district court concluded that Nationwide was not liable to either the Dungans or the FmHA on the insurance policy and granted the declaratory judgment in its favor. The court also denied both the Dungans' and the FmHA's claims, 634 F.Supp. 674 (S.D.Miss.1986). We affirm.

I.

In 1974 the Dungans constructed a home near Pattison, Mississippi. In January 1982 Harold Dungan sought insurance coverage for this home from Nationwide. About January 6, 1982,[1] Dungan called

---

1. The record in this case contains conflicting testimony regarding the precise date on which Dungan called Farrar to discuss coverage and the date on which Farrar and her supervisor, Robert Whitlatch, drove to Dungan's home to receive his application. While the application bears the date of January 7, 1982, it appears that it might have been taken some days after that and then backdated. The Dungans' counsel argued that the backdating was relevant on the issue of credibility. The district court did not determine the exact date on which the applica-

June H. Farrar, a Nationwide agent, to inquire about obtaining insurance. Shortly thereafter, Farrar and Whitlatch drove to Dungan's home to take his application for insurance. Following a review of the premises, Farrar and Dungan returned to the den of the house to fill out the application form. Because it was normal practice in the application process and because Dungan's eyeglasses were being repaired and no others were available to him, Farrar stated the questions on the form verbatim and filled out the form in accordance with the answers provided by Dungan. Basically, his answers indicated that there had been no past losses, that he had never had any policy cancelled or not renewed, that he had never filed for bankrupty, and that no mortgages were held on the property. The application was then signed by Dungan as the insured. The signature of the insured was located just below and presumably in accordance with a warranty appearing on the face of the application which stated, "I hereby declare that the facts stated in the above application are true and request the company to issue the insurance and any renewals thereof in reliance thereon." Thereafter Nationwide issued its policy insuring the Dungans' home.

Early on July 19, 1984, the Dungans' home was completely destroyed by fire. At the time the Dungans were not at home. Nationwide received notice of the loss the same day and assigned the claim to Bill Stevenson. Stevenson later met with Dungan and secured his signature on a non-waiver agreement [2] and his permission to go onto the premises to investigate the cause of the fire. Stevenson conducted a brief investigation of the fire damage, determining that there was a total fire loss.

The next day Stevenson met with the Dungans at a motel in Vicksburg, Mississippi, for the purpose of taking a statement and disbursing claim materials to them. A transcript of the statement was admitted in evidence. In this statement Dungan stated that he owed the FmHA about $250,000 to

$275,000; that he was current on his debt; that there was no mortgage on his home; that the only previous loss that he claimed insurance for was eight to ten years ago on a mobile home that burned, for a total loss of about $12,000; and that he never had an insurance policy cancelled or refused renewal.

After meeting with the Dungans, Stevenson went to Fayette, Mississippi, to perform a routine search of the courthouse records to verify ownership of the property. He learned from the records that FmHA held a mortgage on the Dungan residence. Stevenson then went to the Jefferson County office of the FmHA in Fayette and talked with James O. Taylor, FmHA County Supervisor, concerning the Dungans' mortgage. Taylor informed him that FmHA held a mortgage on the Dungans' home and that the Dungans were delinquent in payment of accounts owed to FmHA totaling $381,736.84. Stevenson produced to Taylor a waiver of records form signed by the Dungans, and Taylor allowed him to examine the Dungans' file. There Stevenson found an old insurance policy issued to the Dungans by United States Fidelity & Guaranty Company (USF & G) through the Gage Insurance Agency (Gage) in Port Gibson, Mississippi.

Back in Port Gibson and upon information provided by Gage employees, Stevenson learned that less than a month prior to the issuance of the Nationwide policy, USF & G had cancelled four policies of insurance which it had with the Dungans. These included a homeowner's policy in the names of the Dungans covering their Pattison residence and an inland marine policy and two fire policies, all payable to Harold Dungan. The effective date of the USF & G policies was November 16, 1981, and they were cancelled effective December 28, 1981.

Stevenson also learned that contrary to the statements contained on the Nationwide application, USF & G had paid Harold

---

tion was taken, nor did it discuss its impact on the issue of credibility.

**2.** The non-waiver agreement provided that Nationwide was not waiving any of its defenses under law or the terms of the contract by investigating the cause or amount of the fire loss.

Dungan $54,500 on a bulldozer fire that occurred on April 9, 1981, and that Foremost Insurance Company had paid him for a total loss on a double-wide mobile home that burned on January 26, 1974, and some $200 for a loss occasioned by lightning's striking the mobile home on May 18, 1971. Stevenson calculated that the debts owed by the Dungans as of July 25, 1984, including outstanding notes to the Federal Land Bank Association of Brookhaven, two Port Gibson banks and a Vicksburg bank, collectively totaled $464,470.56.

Based on the investigation by Stevenson, Nationwide exercised its right under the policy to demand that the Dungans submit to an examination under oath on September 14, 1985, concerning the fire loss. Dungan's responses to questions posed in the examination were adopted by Mrs. Dungan. The substance of pertinent parts of his responses were: that his total outstanding debt to FmHA was between $250,000 and $300,000; that their financial condition was "good"; that the only prior cancellations or non-renewals of insurance policies had been in connection with automobile policies; that the only prior losses he had suffered were fires in his trailer and his father's home, in which he was living at the time it burned; and that the contents loss inventory form filled out in connection with the home fire was accurate. The examination under oath was never amended by the Dungans prior to trial.

On October 23, 1984, the Dungans submitted a sworn statement in proof of loss to Nationwide claiming coverage under the policy in the amount of $200,600 including in excess of $60,000 for loss of contents and home furnishings. The claim was forwarded to Ken Yeager, Nationwide's district claims manager for all of Mississippi, who determined, based upon advice of counsel, to deny the claim on November 9, 1984.[3] On November 16, 1984, the action requesting declaratory relief was filed by Nationwide.

The Dungans' version of the facts of this case is substantially at odds with the proof adduced by Nationwide. In their case-in-chief, Dungan took the position that he informed Farrar of all previous fire losses, previous cancellations of his USF & G policies, and the FmHA's mortgage on much of his land. To the extent that he may have neglected to inform Farrar of all previous losses or cancellations, particularly with regard to the bulldozer fire, a fire in a chicken house he owned, and the prior USF & G cancellations, Dungan stated that he was under the impression that Farrar was asking only if he had any previous fire loss on his home, or if he had any homeowner's insurance cancelled. Dungan pled the same ignorance when confronted with answers he gave Stevenson in the initial statement taken in Vicksburg on July 24. In explanation of the fact that the application bears misinformation concerning his financial and insurance history, the Dungans contend that Farrar, motivated by blind desire to write the coverage and secure her commission, ignored the accurate answers given by Dungan.

In support of their contention that accurate information was provided Farrar, the Dungans called Bill Nicholson as a witness. Nicholson, a close friend of the Dungans for over 30 years, testified that he visted the Dungan home in January 1982. The substance of his testimony was: that he drove alone from his home in Florence, Mississippi, on a day-long ride through west Mississippi to visit friends and relatives; that he arrived at the Dungans' home in the late morning; that he saw a man, presumably Whitlatch, sitting in a car with the motor running on the circular drive in front of the house; that Mrs. Dungan answered the door and led him into the den area; that Dungan and a lady, presumably Farrar, were seated together on the couch; that the lady was apparently filling out a paper which she held in her lap; that

---

**3.** Yeager testified at trial that the reasons for denial were: (1) material misrepresentations existing on the application for insurance; (2) material misrepresentations in the Dungans' examination under oath; (3) material misrepresenta-

tions in the sworn statement in proof of loss, specifically in the contents inventory and amount; and (4) the recommendation of Bill Stevenson.

Dungan and the lady did not stop talking when he came into the den, as Dungan was explaining to her about a bulldozer fire and trailer fire he had previously experienced; that Dungan introduced the lady as his insurance agent; that he went into the kitchen with Mrs. Dungan for coffee, where he was joined by Dungan some short time later; and that he stayed another eight to ten minutes before leaving the house.

After a bench trial, the district court concluded that Nationwide's version was more plausible and credible and therefore believed that version. Because of the misrepresentations, the court held that the policy was void *ab initio* and therefore the Dungans could not recover on the policy.

The district court also found that the Dungans did not list the FmHA as a mortgagee on their residence in the application, the policy or in subsequent documentation of their loss. The language of the "Mortgage Clause" of the policy issued to the Dungans specifically required that any mortgagee claiming benefits under a policy must be named therein. The court found that it was only during the investigation by Bill Stevenson that the interest of the FmHA was disclosed. The court held that since the FmHA was not a named mortgagee it only held an equitable lien. This lien was subject to the same defenses that prevented the Dungans from recovering, and therefore the FmHA was not entitled to the proceeds of the policy.

## II.

■ The Dungans argue that the district court's findings as to some of the subsidiary facts were clearly erroneous. Specifically, they attack the court's finding regarding the dating of the application (see footnote 1, *supra*) and the court's finding that Farrar accurately transcribed Dungan's answers on the insurance application. They also argue that with all the contradictory evidence submitted, the district court was not justified in completely disregarding the testimony of the Dungans and Nicholson and fully believing the testi-

mony of Farrar and Whitlatch. We disagree with all these assertions.

In reviewing a district court's findings of fact, we are governed by Fed.R.Civ.P. 52(a) ("Findings of fact shall not be set aside unless clearly erroneous...."). The Supreme Court expounded upon this standard of review in *Anderson v. City of Bessemer City*, 470 U.S. 564, 574, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518, 528, 529 (1985):

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

> \*   \*   \*   \*   \*   \*

> When findings are based on determinations regarding the credibility of witnesses, Rule 52 demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said.

Based on our review of the record, we conclude that the district court was not clearly erroneous in its factfinding. In its memorandum opinion the court made careful, detailed findings of fact and analyzed contradictions in the evidence presented. Although there is another permissible view of the evidence, the factfinder's view of the evidence cannot be said to be wrong.

Moreover, many of the findings were based on determinations regarding the credibility of the witnesses. In such a case where the district court carefully considers the testimony of witnesses, and makes a credibility decision based on the demeanor and tone of voice, which we do not have the opportunity to judge, we cannot say the court was clearly erroneous.

The Dungans argue, however, that the district court erred in disregarding the testimony of the Dungans and Nicholson and

believing the testimony of Farrar and Whit-latch. We do not believe the trial court committed error in its assessment of the credibility of the witnesses. We will not depart from such an assessment except in the very rarest of circumstances. *Travelers Indemnity Co. v. Calvert Fire Insurance Co.,* 798 F.2d 826, 836 (5th Cir.1986) (citing *Ruiz v. Estelle,* 679 F.2d 1115, 1131 (5th Cir.1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983)).

The present case is not the very rarest of circumstances. The district court was faced with conflicting testimony. To resolve the conflict the court had to make certain credibility choices, as is its duty as the finder of fact. The court made the choices and stated its reasons for crediting the testimony of Nationwide's witnesses and not the Dungan's witnesses.[4] On appellate review, we cannot reassess the credibility of the witnesses. Therefore, we affirm the district court's ruling regarding the claims raised by the Dungans.[5]

## III.

■ The next issue we deal with is whether the FmHA, as an unnamed mort-gagee, is entitled to recover the proceeds of the Dungans' insurance policy. The FmHA argues that Miss.Code Ann. § 83–13–9 allows them to do so.[6] Nationwide argues that because FmHA is not named as a mortgagee in the insurance policy the statute does not apply. Therefore, the FmHA has only an equitable lien upon the proceeds of the policy, subject to any defenses that may be asserted against the Dungans. Since the Dungans could not recover, neither can the FmHA. The district court concurred with Nationwide's argument. Thus, we must decide whether the protection provided by Miss.Code Ann. § 83–13–9 applies to an unnamed mortgagee.

The Mississippi Supreme Court has held that the mortgage clause contained in section 83–13–9 becomes part of every fire insurance policy "irrespective of any mortgage clause inserted by the insurance company to the contrary; [section 83–13–9] constitutes the only mortgage clause that can be placed in the policy." *Bacot v. Phenix Insurance Co.,* 96 Miss. 223, 50 So. 729, 732 (Miss.1909). *See also National Security Fire & Casualty Co. v. Mid-State Homes, Inc.,* 370 So.2d 1351, 1353 (Miss.1979). Furthermore, section 83–

---

**4.** For example, the district court disbelieved the Dungans' version that Farrar incorrectly answered the questions out of a desire to make her commission because, on the day Farrar and Whitlatch came to the Dungan home to take the application, Dungan also showed them a rental home and a deer camp cabin he owned in the vicinity and requested that Nationwide provide coverage for these houses. After brief inspection, Farrar denied the requested coverage. The court felt that had she been motivated by a desire to come away with the largest premium check she could get, it was logical to assume that she would have assumed the coverage on those houses as well, but she did not.

The district court was also unable to credit Nicholson's testimony because Nicholson could recall no details about his visit to the Dungans—i.e., the make or color of car in which Whitlatch was allegedly sitting when Nicholson came to the door; the date or day of the week of his visit; anything about Farrar except that she was holding papers in her lap—except the specifics of a conversation in which he had no apparent interest. The court also felt it was incredible that, without phoning first, he would have driven from Florence to the Dungans' home, a distance of some 60 miles, in icy conditions, for an eight to ten minute social visit. Additionally, Dungan testified that he had completely forgotten about Nicholson's visit on the day the application was taken until Nicholson volunteered his information in informal communications some six to eight months prior to trial.

**5.** Given all the other evidence in the case regarding the Dungans' misrepresentations, we do not feel that the lack of a finding by the district court as to the exact date that Farrar drove to the Dungans' home (see footnote 1, *supra*) is critical to its overall credibility assessment.

**6.** Section 83–13–9 provides, in part:
MORTGAGE CLAUSE
Each fire insurance policy on buildings taken out by a mortgagor or grantor in a deed of trust shall have attached or shall contain substantially the following mortgagee clause, viz:
Loss or damage, if any, under this policy, shall be payable to (here insert the name of the party), as _____ mortgagee (or trustee), as _____ interest may appear, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, ....

13–9 incorporates a "union" or "standard mortgage clause," as opposed to a "loss-payable" or "open-mortgage" clause into the fire insurance policy. *Hartford Fire Insurance Co. v. Associates Capital Corp.*, 313 So.2d 404, 407 (Miss.1975). Under a "union" mortgage clause the mortgagee's right to the proceeds of the policy is not invalidated by any act or negligence of the mortgagor; any breach of the policy terms by the mortgagor is no defense to an action by the mortgagee. *Id.* *See also Weems v. American Security Insurance Co.*, 450 So.2d 431, 436 (Miss.1984); 5A Appleman, *Insurance Law & Practice* § 3401, at 289–92 (1970). As described by the Mississippi Supreme Court in *Hartford*, the effect of a "union" mortgage clause is to create "an independent contract between the insurance company and the mortgagee." *Hartford*, 313 So.2d at 407 (citing, *inter alia, Bacot v. Phenix Insurance Co.*). Under a "loss-payable" clause, in contrast, the mortgagee is only entitled to receive the amount due him out of the funds recovered by or due to the insured; a loss-payable clause does not make the mortgagee a party to the contract. *Hartford*, 313 So.2d at 407.

There do not appear to be any Mississippi cases which decide whether section 83–13–9 is applicable to unnamed mortgagees as well as to named mortgagees or whether, as Nationwide asserts, an unnamed mortgagee only "stands in the shoes of the mortgagor." In *Employers Mutual Casualty Co. v. Standard Drug Co.*, 234 So.2d 330 (Miss.1970), the Mississippi Supreme Court faced the issue of whether the absence of a mortgage clause in favor of the mortgagee, Standard Drug, barred its recovery under an insurance policy. The court held that Standard Drug could recover despite the absence of a mortgage clause in its favor. *Id.* at 330–31. The court noted:

As a general rule, if the mortgagor covenants to keep the mortgaged property insured for the better security of the motgagee [sic], the latter will have an *equitable lien* upon the proceeds of insurance carried by the mortgagor, in case of a loss, to the extent of his interest in the property destroyed, even though the policy contains no mortgage clause and is payable to the mortgagor.

*Id.* at 332–33 (quoting 5 Couch *Insurance 2d*, § 29:82, at 366–67 (1960)) (emphasis added). In *Employers Mutual*, unlike the instant case, there were no defenses asserted against the mortgagor; consequently, the court did not have to address the applicability of section 83–13–9 to unnamed mortgagees since Standard Drug could recover on an equitable lien theory. An equitable lien would only put an unnamed mortgagee like the FmHA in the same position as the Dungans; if applied to this case, the FmHA could not recover since the Dungans cannot recover.

In *Merchants National Bank v. Southeastern Fire Insurance Co.*, 751 F.2d 771, 780 n. 6 (5th Cir.1985), a panel of this court, in discussing section 83–13–9, concluded in dicta that an unnamed mortgagee has the same rights as an ordinary equitable lien holder:

[W]e do not read section 83–13–9 as requiring the mortgagee to be listed as a condition to claiming the benefits of the insurance policy when the mortgagor neglects to place his name on the policy. It does seem, however, that section 83–13–9 may be read to provide that unlisted mortgagees stand in the shoes of the mortgagor.... We specifically note, however, that this particular question of statutory interpretation is not before us and has not been briefed or argued, and consequently our comment is, at best, dicta.

We agree with the conclusion of the court in *Merchants National Bank* and hold that the FmHA has only an equitable lien under section 83–13–9 and thus cannot recover against Nationwide.

As support for our conclusion we note that the provision written into a fire insurance policy by virtue of section 83–13–9 contains a place for the mortgagee's name to be filled in. This can be interpreted to reflect an intent on the part of the legislature that there be some sort of agreement between the insurance company and either the owner or the mortgagee that insurance

be provided for the mortgagee. In this case, Nationwide believed, on the basis of the Dungans' representation to it, that the premises were not mortgaged; the Dungans knew that the policy named no mortgagee; and the FmHA had no idea that the Nationwide policy even existed until after the fire. In addition, section 83–13–9 allows the insurance company to cancel the policy ten days after giving notice to the mortgagee.[7] If section 83–13–9 applies to unnamed mortgagees, an insurance company's right to cancel the policy would be meaningless, where, as in this case, the insurance company has been informed and believes that there is no mortgagee.

The government relies heavily on *National Security Fire & Casualty Company v. Mid-State Homes, Inc.*, 370 So.2d 1351 (Miss.1979), to support its position that the FmHA, even though it is an unnamed mortgagee, is entitled to recover under the insurance policy. The government cites the language in that opinion adopting Justice Ethridge's construction of section 83–13–9 in *Barry & Brewer v. Wright*, 168 Miss. 216, 231–32, 150 So. 186 (1933), and contends that this demonstrates that a mortgagee need not be named to be covered by section 83–13–9. We disagree.

We find nothing in the court's discussion in *National Security* which answers the question whether an unnamed mortgagee is covered by section 83–13–9. Justice Ethridge's discussion merely discusses the general purpose of the statute; it does not answer the issue posed by this case. Indeed, the court in *National Security* spe-

cifically indicated that the policy at issue in that case did name the mortgagee. 370 So.2d at 1352. Accordingly, we find the government's argument unpersuasive and agree with Nationwide that section 83–13–9 applies only to named mortgagees.[8]

#### IV.

For the reasons stated above, we conclude that the district court's findings of fact are not clearly erroneous. We also conclude that section 83–13–9 forms an independent contract only between the insurance company and a named mortgagee. Accordingly, the judgment of the district court is AFFIRMED.

---

7. The relevant portion of section 83–13–9 reads as follows:

   [The insurance] company reserves the right to cancel this policy at any time as provided by its terms, but in such case this policy shall continue in force for the benefit only of the mortgagee (or trustee) for ten days after notice to the mortgagee (or trustee) of such cancellation and shall then cease, and this company shall have the right on like notice to cancel this agreement.

8. We also find the government's reliance on *Standard Fire Insurance Co. v. United States*, 407 F.2d 1295, 1299 n. 5 (5th Cir.1969), to be misplaced. First, as the government concedes,

*Standard Fire* involves an interpretation of Texas law, and not Mississippi law, which is the relevant law in this case. Second, the Texas statute involved in that case, unlike section 83–13–9, does not insert a specific clause into every fire insurance policy which provides a place for the mortgagee to be listed. Thus, unlike the Texas statute in *Standard Fire*, section 83–13–9 can be read as requiring that a mortgagee be named to be covered by the statute. Finally, there was no question in *Standard Fire* that the insurance company was aware of the existence of a mortgagee at the time the policy was issued. In contrast, Nationwide was unaware of the FmHA's status until after the loss had occurred.