John Robert CLARE, Individually and as Representative of Those Certain Underwriters at Interest at Lloyd's London Subscribing to Certificate of Insurance No. TSL 17198, Plaintiff and Counter-Defendant,

v.

Jim RICHARDS and City National Bank of Sulphur Springs, Defendants and Third–Party Plaintiffs,

v.

TEXAS SPECIALTY FINANCE, INC., Third–Party Defendant.

No. 3:97–CV–39.

United States District Court, E.D. Texas, Paris Division.

Oct. 31, 1997.

John Baldwin Gedie, Elizabeth L. McDavid, Greenberg, Peden, Siegmyer & Oshman, Houston, TX, for Plaintiff.

Larry A. Powers, Powers & Blount, Sulphur Springs, TX, Craig Michael Daugherty, Tyler, TX, for Defendants.

*MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT*

SCHELL, Chief Judge.

This matter is before the court on Plaintiff's Motion for Summary Judgment filed on August 28, 1997. Defendants filed a response to Plaintiff's motion on September 16, 1997. Plaintiff filed a reply to Defendants' response on October 1, 1997. Defendants filed a response to Plaintiff's reply on October 17, 1997, followed by Plaintiff's sur-reply on October 29, 1997. Upon consideration of the motion, responses, replies, and applicable law, the court is of the opinion that Plaintiff's motion should be DENIED.

## I. BACKGROUND

The facts in this case are not in dispute. Defs.' Resp. to Plf.'s Mtn. for Summ. J. at 2 (stating "The Motion for Summary Judgment of Lloyd's accurately and fairly summarizes the nature and factual background of this suit."). On or about November 18, 1996, John H. Heilman ("Heilman") applied for a commercial property insurance policy ("Policy") to insure Pete's Place, a restaurant and bar, which Heilman operated in Pittsburg, Texas. Heilman listed Defendants Jim Richards ("Richards") and City National Bank of Sulphur Springs ("City National") (collectively "Defendants") as "additional interests" on the Policy. Plf.'s Mtn. for Summ. J. at 3. Richards owned the building and property on which Pete's Place was located. City National also held a mortgage on this property. Plf.'s Amd. Cmplt., Ex. B.

After filing his insurance application, Heilman entered into an insurance premium financing agreement with Third Party Defendant Texas Specialty Finance, Inc. ("TSF"), an insurance premium financing company. Plf.'s Mtn. for Summ. J. at 3. Pursuant to his financing agreement with TSF, Heilman gave TSF full power of attorney to cancel the insurance policy and collect any return premiums in the event that Heilman failed to pay the policy premiums when due. *Id.* On December 2, 1996, after Heilman secured financing for the policy premiums, Texas Specialty Underwriters issued the Policy to

Heilman and Pete's Place.[1] The Policy's effective dates were to be from November 13, 1996, until November 13, 1997. *Id.* at 4.

TSF then issued a confirmation of financing and a payment coupon book to Heilman and Pete's Place on December 11, 1996. *Id.* at 3. Heilman failed to make payment on a premium due January 15, 1997, however, and TSF mailed him notice of its intent to cancel the Policy. This notice informed Heilman that TSF would cancel the Policy if he did not make payment by January 30, 1997. *Id.* at 4. Heilman failed to make payment by the January 30, 1997, cancellation date. Therefore, pursuant to its power of attorney, TSF sent notice of cancellation to Underwriters on January 31, 1997. Id. Neither TSF nor Underwriters sent notice of cancellation to Richards or City National at that time. Id. On February 6, 1997, Underwriters issued a General Change Endorsement canceling the Policy effective January 31, 1997. *Id.* at Ex. A–4.

A fire destroyed Pete's Place on February 9, 1997. On February 6, 1997, Underwriters had mailed written notice to Defendants that TSF had canceled the Policy effective January 31, 1997. *Id.* at Ex. C. Prior to this notice, however, Underwriters had not informed Defendants of the Policy's cancellation. Subsequently, Defendants demanded payment as additional interests (mortgagees) under the Policy. Underwriters refused payment, however, contending that they had no duty to Defendants to either (1) give them notice of cancellation or (2) pay them, since the Policy was canceled prior to the February 9, 1997, fire. Underwriters then filed the current suit on April 4, 1997, seeking a declaratory judgment declaring that (1) the Policy was canceled as to the interests of Defendants effective January 31, 1997, and (2) Underwriters have no duty to indemnify Defendants for any losses resulting from the February 9, 1997, fire. Underwriters now move for summary judgment.

## II. Summary Judgment Standard

The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Summary judgment is proper if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The substantive law identifies which facts are material. *Id.* at 248, 106 S.Ct. at 2510. The party moving for summary judgment has the burden to show that there is no genuine issue of fact and that it is entitled to judgment as a matter of law. *See id.* at 247, 106 S.Ct. at 2510. If the movant bears the burden of proof on a claim or defense on which it is moving for summary judgment, it must come forward with evidence that establishes "beyond peradventure *all* of the essential elements of the claim or defense." *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). But if the nonmovant bears the burden of proof, the movant may discharge its burden by showing that there is an absence of evidence to support the nonmovant's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553. In this instance, the movant is not required to offer evidence to negate the nonmovant's claims. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 885–86, 110 S.Ct. 3177, 3187, 111 L.Ed.2d 695 (1990). Once the movant has carried its burden, the nonmovant "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). The nonmovant must adduce affirmative evidence. *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514.

---

1. Texas Specialty Underwriters issued the Policy on behalf of "those Certain Underwriters at Interest at Lloyd's, London Subscribing to Certificate of Insurance No. TSL17198." Plf.'s Mtn. for Summ. J., Ex. A. Plaintiff John Robert Clare filed the present cause of action individually and in his capacity as a representative of the Lloyd's Underwriters. In the interest of clarity, the court will refer to these parties collectively as "Underwriters."

Summary judgment evidence is subject to the same rules that govern admissibility of evidence at trial. *Lavespere v. Niagara Machine & Tool Works, Inc.*, 910 F.2d 167, 175–76 (5th Cir.1990), *cert. denied,* 510 U.S. 859, 114 S.Ct. 171, 126 L.Ed. 2d 131 (1993). In considering a motion for summary judgment, the court cannot make credibility determinations, weigh evidence, or draw inferences for the movant. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.. The evidence of the nonmovant, however, is to be believed, and all justifiable inferences are to be drawn in the nonmovant's favor. *Id.*

### III. ANALYSIS

Premium finance agreements are allowed under Texas law. *See e.g.,* TEX. INS. CODE ANN. art. 24.11 (Vernon 1981). "A premium finance agreement may contain a power of attorney enabling the premium finance company to cancel any insurance contract or contracts listed in the agreement." *Id.* at art. 24.17(b). The premium finance company may cancel a policy for failure to pay premiums only after written notice of the company's intent to cancel no "earlier than the 10th day after the date on which the written notice was mailed." *Id.* at art. 24.17(c). After such period has expired, the company may cancel the insurance contract as if it were the insured and must mail notice of cancellation to the insured and to the insurance agent or broker. *Id.* at art. 24.17(d).

In the present case, the parties do not dispute that these provisions of the Texas Insurance Code govern Heilman's Policy. Further, the parties do not contend that Underwriters violated any provision of the Policy, and they do not dispute the propriety of TSF's and Underwriters' actions in canceling the Policy as to Heilman. Instead, the dispute centers on whether TSF's actions in canceling the Policy also served to cancel the Policy as to Defendants on January 31, 1997.

Underwriters contend that when the Policy was canceled as to Heilman, it was also canceled as to the interests of Defendants effective January 31, 1997. Thus, Underwriters argue that they have no duty to pay Defendants for their losses resulting from the February 9, 1997, fire. Defendants counter that

Underwriters are not entitled to judgment because TSF only canceled the Policy as to Heilman. According to Defendants, neither Underwriters' nor TSF's actions canceled the Policy as to Defendants' interests.

■ In support of this argument, Defendants argue that Article 6.15 of the Texas Insurance Code imposed a duty upon Underwriters to give Defendants reasonable notice of cancellation and, without such notice, the Policy was still in effect as to Defendants' interests at the time of the February 9, 1997 fire. The court must determine, therefore, (1) whether Article 6.15 applies in the present case and, if so, (2) whether Underwriters effectively canceled the Policy as to Defendants' interests in accordance with that provision of the Texas Insurance Code.

■ Article 6.15 of the Texas Insurance Code states:

> The interest of a mortgagee or trustee under any fire insurance contract hereafter issued covering any property situated in this State shall not be invalidated by any act or neglect of the mortgagor or owner of said described property or the happening of any condition beyond his control, and any stipulation in any contract in conflict herewith shall be null and void.

TEX. INS.CODE ANN. art. 6.15 (Vernon 1981). "The purpose and effect of Article 6.15 is to protect mortgagees from mortgagor derelictions with respect to insurance policies on mortgaged property...." *Standard Fire Ins. Co. v. United States,* 407 F.2d 1295, 1299 (5th Cir.1969). The practical impact of Article 6.15 is to create a separate insurance contract between the insurer and the insured's mortgagee, which is unaffected by the acts or omissions of the mortgagor/insured. *See id.* at 1300 (citing *Camden Fire Ins. Assn. v. Harold E. Clayton & Co.,* 117 Tex. 414, 6 S.W.2d 1029, 1030 (1928)). "[T]he statute immunizes the mortgagee against the legal consequences of any act done by the mortgagor or owner either prior or subsequent to issuance of the policy in question." *St. Paul Fire & Marine Ins. Co. v. Crutchfield,* 162 Tex. 586, 350 S.W.2d 534, 537 (1961). Further, Article 6.15 does not require "that the protected mortgagee be men-

tioned [in the insurance contract] either by name or by status." *Standard Fire,* 407 F.2d at 1299 n. 5.

For example, in *Standard Fire,* the insurer, Standard Fire Insurance Company ("Standard"), canceled its insured's policy for non-payment of premiums. *Id.* at 1297. Standard gave oral notice of such cancellation to the insured's mortgagee, the Small Business Administration ("SBA"), which was a loss payee under the policy. When a fire destroyed the insured's property two months later, the SBA claimed that it had not received proper notice of cancellation and demanded payment under the policy. *Id.* Standard refused payment, however, claiming that nothing in the insured's policy required notice to be given to any mortgagee. At trial, the district court found that the SBA was entitled to notice of cancellation and that since such notice was not given, Standard had not effectively canceled the policy as to the rights of the SBA. Id. The Fifth Circuit affirmed, holding that "Article 6.15 became a part of Standard's fire insurance policy as though it were printed there in haec verba." *Id.* at 1299. Thus, "Standard could not cancel this ... policy as to the interest of ... the SBA ... because of a failure of [the insured] to make timely payments on the premium note, at least not without giving reasonable notice to the mortgagees of its intention to cancel the policies." *Id.*

Just as Article 6.15 became a part of the insurance contract in *Standard Fire,* it became a part of the Policy in the present case. Heilman's Policy included coverage for loss due to fire. Plf's Mtn. for Summ. J. at Ex. A–2 ("Causes of Loss–Basic Form"). Heilman listed City National and Richards as "additional interests" on his insurance policy application. *Id.* at Ex. A–1. The Policy also lists City National and Richards under the "Special Conditions" section of the Declaration Page. *Id.* at Ex. A–2.[2] Further, Underwriters do not contend that Defendants are not entitled to mortgagee status. Thus, City National and Richards were "mortgagees" as that term is used in Article 6.15. *See Stan-*

*dard Fire,* 407 F.2d at 1299 n. 5 (holding that a mortgagee need not be expressly identified as such to be entitled to the protections afforded under Article 6.15).

Underwriters nevertheless maintain that *Standard Fire* does not apply here because that case is distinguishable on the facts. They argue that since it was the *insurer,* and not the *insured,* who canceled the policy in *Standard Fire,* the facts of that case are in conflict with the facts of the present one. While Underwriters are correct that the policy at issue in *Standard Fire* was canceled by the insurer, and not the insured, the Fifth Circuit's reasoning is equally applicable to the present case.

The court's focus in *Standard Fire* was not upon who canceled the policy but, rather, upon *why* the policy was canceled. In that case, Standard canceled its insured's policy for failure to pay premiums—an omission on the part of the insured/mortgagor. In the present case, as stated above, a party standing in the shoes of the insured canceled the Policy. So, for the purposes of this argument, the court views the premium financing company in the same manner as the insured. Thus, like the policy in *Standard Fire,* the policy at issue in this case was canceled because of an act or omission on the part of the insured/mortgagor: the failure to pay premiums. The events leading to the cancellation of each policy are the same, and the mortgagee's relationship to the cancellation, that of innocent bystander, is the same. Accordingly, *Standard Fire* is applicable to the facts of this case.

■ Underwriters next argue that, even if *Standard Fire* is not distinguishable on the facts from the present case, it still does not apply here because Article 24.17, not Article 6.15, is controlling. Texas Insurance Code article 24.17(e) provides:

> **All statutory, regulatory, and contractual restrictions providing that the insurance contract may not be canceled unless notice is given to a governmental**

---

2. Moreover, Paragraph F, section 2 of the Policy's "Building and Personal Property Coverage Form" states that Underwriters "will pay for covered loss of or damage to buildings to each

mortgage holder shown in the Declarations in their order of precedence, as interests may appear." *Id.*

**agency, mortgagee, or other third party apply where cancellation is effected under this section.** The insurer shall give the prescribed notice on behalf of itself or the insured to any governmental agency, mortgagee, or other third party on or before the second business day after the day on which it receives the notice of cancellation from the premium finance company and shall determine the effective date of cancellation taking into consideration the number of days' notice required to complete the cancellation.

TEX. INS.CODE ANN. art. 24.17(e) (Vernon 1981) (emphasis added). Underwriters contend that Article 24.17(e) establishes the extent of an insurer's duties in canceling a Policy as to the interests of a mortgagee. Because this provision refers only to statutory, regulatory, and contractual notice restrictions, however, and Article 6.15 contains no such language regarding notice, Underwriters argue that neither statute imposed upon Underwriters a duty to give Defendants notice of cancellation. Since no duty of notice was owed to Defendants, continue Underwriters, the Policy was canceled as to Defendants' interests on January 31, 1997.

Article 24.17(e) and Article 6.15 are not in conflict. Article 24.17(e) simply states that any statutory, regulatory, or contractual provisions requiring that notice of cancellation be given to an insured's mortgagee apply when a policy is canceled pursuant to Article 24.17. *Id.* at art. 24.17(e). Article 24.17(e) refers only to express statutory, regulatory, and contractual *notice* provisions; it does not refer to any statutory, regulatory, or contractual provisions which do not impose a notice requirement on their face. Article 6.15 does not impose a notice requirement on its face.[3] Moreover, even if Article 6.15 does impose a notice requirement on its face, there is nothing in either provision of the Texas Insurance Code which suggests that one provision would be in conflict with the other. Further, Article 24.17(e) does not apply to common law notice requirements. Nothing in Article 24.17 suggests that it applies to the exclusion of either the common law or another provision of the Texas Insurance Code. To the contrary, Article 24.17(e) merely puts insurers on notice that even when a policy is canceled by an insured or his agent, the insurer may nevertheless need to comply with certain statutory or contractual notice provisions with respect to the insured's mortgagee(s). Thus, Article 24.17 does not negate the applicability of either Article 6.15 or *Standard Fire* in the present case.

■ Having decided that Article 6.15 applies in the present case, the court must next determine whether TSF's cancellation of the Policy also canceled the Policy as to Defendants. The court must answer this question in the negative. Article 6.15 clearly states that a mortgagee's interest under an insurance policy cannot be impaired by *"any act or neglect"* of the mortgagor. See TEX. INS. CODE ANN. art. 6.15 (Vernon 1981) (emphasis added). Thus, even an act by the insured that would preclude his right to recovery under his insurance policy does not affect his mortgagee's right to recovery of its interests under the same policy. *See, e.g., Georgia Home Ins. Co. v. Golden,* 127 Tex. 93, 91 S.W.2d 695, 696 (1936). In the present case, TSF's actions constituted an "act" or "neglect" on the part of Heilman, Underwriters' insured. TSF's actions did not serve to cancel the Policy as to Defendants' interests. Pursuant to Article 6.15, therefore, when TSF canceled the Policy as to Heilman, the Policy was still in effect as to the rights of Defendants.

■ Defendants argue that once TSF canceled the Policy, it could only be canceled as to Defendants' interests if Underwriters gave Defendants reasonable notice of cancellation. Because Underwriters did not notify Defendants of the Policy's cancellation until six days after TSF canceled the Policy, Defendants contend that the Policy was still in effect as to their interests on February 9,

---

3. While the Fifth Circuit held in *Standard Fire* that reasonable notice was required pursuant to the facts in that case, the court did not hold that Article 6.15 expressly imposes a notice requirement or requires notice in all circumstances. Instead, the court held that reasonable notice is at least one method by which an insurer may cancel an insurance policy as to the interests of the insured's mortgagee. *Standard Fire,* 407 F.2d at 1300.

1997. Conversely, Underwriters maintain that no such notice was required.

█ Just as the Fifth Circuit observed nearly thirty years ago in *Standard Fire,* this court notes that there is a dearth of case law on the issue of under what circumstances an insurer can effectively cancel an insurance policy as to the interests of a mortgagee pursuant to Article 6.15. It is clear, however, that Article 6.15 "is largely a legislative adoption of the interpretation which the courts of this country have given to the so-called Union Mortgage Clause...." *Citizens State Bank v. American Fire & Casualty Co.,* 198 F.2d 57, 60 (5th Cir.1952) (internal quotations omitted). Such a clause essentially creates two insurance contracts— the insurer's underlying contract with the insured and an additional contract between the insurer and the mortgagee. *See* Section III, page 6, *supra.* This additional contract should afford the mortgagee the same benefits as if it had entered into the insurance contract in the place of the insured. *See, e.g., Insurance Co. of North America v. Rall,* 360 Pa.Super. 374, 520 A.2d 506, 509 (1987) (interpreting the effect of a standard mortgage clause under Pennsylvania law). The effect of a Union Mortgage Clause-and thus Article 6.15-is to make the mortgagee's interests contingent only upon the acts of the mortgagee. *See American Fire & Casualty Co.,* 198 F.2d at 60.

█ When a contract is governed by Article 6.15, the mortgagee should be entitled to the same general protections it would receive if it were an original party to the contract. Like the Fifth Circuit in *Standard Fire,* therefore, this court "will assume without deciding that the Texas courts would interpret Article 6.15 to permit such cancella-

tion if the mortgagee had been given reasonable notice prior thereto." *Standard Fire Ins. Co. v. United States,* 407 F.2d 1295, 1300 (5th Cir.1969). Here, Underwriters gave Defendants no notice of any kind until February 6, 1997, a full six days after the Policy had been canceled. Thus, Defendants did not have an opportunity to secure an alternative means of insurance coverage on the property insured under Heilman's Policy before the Policy was canceled. Such a dilemma is the precise type of problem sought to be avoided by affording "unequivocal statutory protection" under Article 6.15. *Id.* Accordingly, the Policy was not canceled as to the interests of Defendants prior to the February 9, 1997 fire.[4]

## IV. CONCLUSION

Article 6.15 became a part of Heilman's Policy the moment Underwriters issued the Policy. Under Article 6.15, neither the acts of Heilman nor TSF, through its power of attorney, served to cancel the Policy as to the interests of City National or Richards. Further, Underwriters did not give reasonable notice of cancellation to City National and Richards. Therefore, the court cannot rule as matter of law that (1) the Policy was canceled as to the interests of Defendants on January 31, 1997 or (2) that Underwriters have no duty to indemnify Defendants for their losses incurred as a result of the February 9, 1997, fire. Accordingly, Plaintiff's Motion for Summary Judgment is DENIED.

4. Underwriters also argue that this court should refuse to interpret Article 6.15 as imposing upon Underwriters a duty to give Defendants reasonable notice of cancellation, because such an interpretation would create an unconstitutional impairment to Underwriters' freedom to contract. Plf.'s Reply at 7–8. Specifically, Underwriters argue that such a requirement would make it impossible to cancel an insurance policy as to the rights of the insured's mortgagee. The court finds Underwriters' argument unconvincing. Article 6.15 does not make insurance contracts impossible to cancel; its effect is to protect an unsuspecting mortgagee from the acts of the mortgagor/insured. *See Standard Fire,* 407 F.2d at 1300. As previously stated, an insurer can likely cancel such a policy simply by giving the mortgagee reasonable notice of cancellation. An insurer could also likely cancel a policy as to the rights of a mortgagee if the mortgagee is guilty of some wrongful act which should prevent recovery. *See American Fire & Casualty Co.,* 198 F.2d at 60. Thus, such a notice requirement is not an unreasonable limitation upon the freedom to contract.