592 So.2d 66 (1991)
Robert A. CARTER d/b/a Possum Hollow and Metropolitan National Bank
v.
ALLSTATE INDEMNITY COMPANY and Their Agent, Ron Dossett.
No. 07-CA-59402.
Supreme Court of Mississippi.
December 11, 1991.
*67 William H. Myers, Gordon Myers Frazier & Roberts, Pascagoula, for appellants.
Arthur F. Jernigan, Phelps & Dunbar, Jackson, for appellees.
Before DAN M. LEE, P.J., and PRATHER and BANKS, JJ.
PRATHER, Justice, for the COURT:

I. INTRODUCTION
The critical issue addressed in this opinion is whether an insurer's mere mailing of a cancellation notice constitutes conclusive proof of actual receipt by the insured. The analysis in this opinion leads to the conclusion that, under relevant statutory law, production of a "certificate of mailing" is not conclusive proof of the insured's receipt of a cancellation notice; rather, the certificate simply constitutes a presumption that the insured received notice. The insured may rebut this presumption and, thus, create a triable issue of fact. Before reaching this analysis, the facts upon which this Court bases its affirmance of the chancellor's decision shall be recited.

A. The Facts
In April 1983, Robert A. Carter owned and operated the Possum Hollow Lounge in Gautier, Mississippi. On April 14, 1983, Carter borrowed $100,000 from Metropolitan National Bank ("Bank") (formerly First National Bank of the South) to refurbish Possum Hollow. As partial consideration for providing the loan, the Bank required Carter to acquire insurance on Possum Hollow. Accordingly, Carter acquired from Allstate Indemnity Company's sales agent, Ron Dossett, a policy in the amount of $150,000. Carter named the Bank as the loss payee.
In August 1983, Allstate conducted a routine inspection of Possum Hollow and, based upon its findings, concluded that it could no longer provide Carter with insurance. Allstate consequently mailed Carter a letter on September 26, 1983, containing a 10-day cancellation notice. Specifically, Allstate informed Carter that, due to Possum Hollow's conditions which it deemed uninsurable "possible sources of loss," it had no choice but to cancel his policy at 12:01 a.m. on October 7, 1983. Allstate secured a "certificate of mailing" as proof that it mailed Carter the notice as required by policy provisions. Pursuant to these provisions:
This policy may be cancelled by [Allstate] by mailing to the named insured at the mailing address shown in the Declarations, written notice stating when not less than ten days thereafter such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period... .
... .
Notice of cancellation addressed to the named insured and mailed to the mailing address shown in the Declarations shall be sufficient notice to effect cancellation of this insurance.
*68 On October 11, 1983, Allstate mailed Carter a refund of unearned premium.
Notably, Allstate did not mail the Bank a copy of the cancellation notice which it had mailed to Carter. Allstate did, however, send a copy to Dossett (its agent), who subsequently discussed the cancellation with Carter.
In November 1983, Carter secured another insurance policy on Possum Hollow in the amount of $175,000 from Lexington Insurance Company; this policy went into effect on November 16. See Plaintiff's Exh. 35.
On November 23, 1983, an arsonist burned Possum Hollow to the ground. A Bank officer telephoned Dossett and asked him about the status of the Allstate policy; Dossett informed him that the policy had been cancelled  effective October 7. Allstate confirmed this phone conversation with a letter to the Bank president; through this letter, Allstate reiterated that it had cancelled the policy in October and that Carter had secured another policy (from Lexington) in the amount of $175,000.
On April 19, 1984, Lexington paid $175,000 jointly to Carter, Juanita (Carter's wife), William Meyers (Carter's lawyer), and the Bank.
Carter subsequently filed a claim for the Allstate policy proceeds, but Allstate denied the claim on the basis that it had cancelled the policy in October. Contending that he never received a cancellation notice and that he is consequently entitled to the policy proceeds, Carter filed a complaint against Allstate and Dossett on May 3, 1984, in the Jackson County Chancery Court, and sought over $6 million in actual and punitive damages.
On November 3, 1986, Carter amended his complaint by adding the Bank as a co-plaintiff. The Bank then filed an "amended complaint" and sought over $1 million in damages because Allstate failed to provide it with notice of cancellation as required by law and policy provisions. Allstate filed its answer to this amended complaint and set forth numerous affirmative defenses. In short, Allstate posited that: (1) The Bank failed to state a claim; (2) The Bank did receive cancellation notice as required by law; and (3) The Bank may not now claim policy proceeds pursuant to "principles of equity." Allstate later withdrew its claim that it had provided the Bank with notice. Allstate's theory against recovery involving the so-called "principles of equity" will be discussed further in Section II(B) of this opinion.
On July 9, 1987, Chancellor Robert H. Oswald held trial. Upon completion of the trial, the chancellor issued a lengthy opinion in favor of Allstate. In short, the chancellor concluded: (1) that Carter is not entitled to recover policy proceeds from Allstate because the insurer provided him with adequate cancellation notice; and (2) that, pursuant to "principles of equity," the Bank is not entitled to recover  notwithstanding Allstate's admitted failure to provide it with cancellation notice as required by law and policy provisions. Again, this "principles of equity" theory will be discussed in Section II(B).
Carter and the Bank appealed the chancellor's decision and presented one issue for disposition:
Whether the [chancellor] erred by ruling in favor of Allstate Indemnity Company, when it held that Allstate had properly cancelled its fire insurance policy in favor of its insured, Robert A. Carter and the loss payee, Metropolitan National Bank?
This issue will be addressed in two parts in the following section of this opinion. The first part will deal with Carter's complaint against Allstate, and the second part will deal with the Bank's complaint.

II. ANALYSIS

A. Part One: Whether the Chancellor Properly Concluded That Allstate Provided Carter with Adequate Cancellation Notice?
As discussed in the preceding section, the Allstate insurance policy held by Carter provided, in part, that:
This policy may be cancelled by [Allstate] by mailing to the named insured at the *69 mailing address shown in the Declarations, written notice stating when[,] not less than ten days thereafter[,] such cancellation shall be effective. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of surrender or the effective date and hour of cancellation stated in the notice shall become the end of the policy period....
Pursuant to this provision, Allstate on September 26, 1983, mailed Carter a letter containing a 10-day cancellation notice and informing him that, due to Possum Hollow's uninsurable condition, it had no choice but to cancel his policy at 12:01 a.m. on October 7, 1983. Allstate also secured a "certificate of mailing" as proof that it mailed Carter the notice.
Carter unpersuasively claims that he did not receive the cancellation notice and that, therefore, he should be entitled to recovery of the policy proceeds. The chancellor rejected Carter's claim on two grounds.
First, the chancellor simply did not believe Carter's claim that he did not receive the cancellation notice:
Although Mr. Carter denies he received the notice of cancellation from Allstate, he does admit he received a letter from Allstate. According to Mr. Carter, that letter indicated only that the policy would not be renewed but did not contain a date of cancellation. Mr. Carter further testified that this letter was lost in the fire at the Possum Hollow Lounge. No such letter, other than the notice of cancellation itself, was found in the files of Allstate.
[A] copy of the cancellation notice was sent to Ron Dossett, Allstate's sales agent.
Mr. Dossett then discussed the cancellation with Carter and informed Carter of the reasons for cancellation. He also agreed to help Carter obtain other insurance on the subject property, although he was unable to find any. Carter admits that he did speak with Dossett regarding other insurance after he received the letter from Allstate.
Carter's actions around the time he should have received the letter strongly suggest that he was aware that the Allstate policy was being cancelled as per the notice of cancellation. For example, although he claims he felt the Allstate policy would be in force until April, 1984, Carter admits that he talked to numerous insurance agents beginning in August or September, 1983, to see about obtaining a policy of insurance on the Possum Hollow Lounge. In fact, he did obtain a policy of insurance on the Possum Hollow Lounge from Lexington Insurance Company, and this policy was in effect on the date of the fire. Carter subsequently collected on this policy.
On or about October 11, 1983, Allstate sent a check to Carter in the amount of $1,146.75 (Ex. 2) as a refund of unearned premium paid by Carter on the policy in question. Although Carter admits he received and negotiated this check, he denies it was for a refund due after cancellation of the subject policy. However, the check does clearly exhibit the policy number on its face.
Moreover, according to the testimony of Mr. John McBeth, an employee of Allstate, the amount of the October 11, 1983, check equaled the amount of the refund which would have been due on Mr. Carter's policy. The amount of this refund was determined by taking the amounts credited to Mr. Carter ($3,406.75 in premium payments, plus a $251.00 dividend credit for a total of $3,657.75) and subtracting the total of the earned premium $2,507.00 for the period (April 15, 1983, through October 7, 1983) and a policy fee of $4.50. The earned premium was determined by prorating the yearly premium of $5235.00.
Following the cancellation of the Allstate policy on October 7, 1983, Carter obtained insurance on the Possum Hollow Lounge with Lexington Insurance Company in the amount of $175,000.00.
On November 23, 1983, the Possum Hollow Lounge burned to the ground, resulting in a total loss. The Lexington Insurance policy was in force at the time of the fire on November 23, 1983, and Lexington subsequently paid Carter and the Bank on this policy in April, 1984.
*70 Record Vol. I, at 173-75. The record supports the chancellor's statement of facts. On the basis of these and other facts, the chancellor concluded that Carter did indeed receive actual notice of the cancellation from Allstate and, therefore, could not recover the policy proceeds.
Alternatively, the chancellor concluded that, under current Mississippi law, actual notice need not be provided by an insurer prior to cancellation of the insured's policy:
Under Mississippi law, an insurance company does not have to prove actual notice by its insured in order to prevail on the issue of cancellation. In Employer's Mutual Casualty Company v. Nosser, [250 Miss. 542] 162 [164] So.2d 426 (Miss. 1964), suggestion of error overruled [250 Miss. 542] 168 So.2d 119 (Miss. 1964), the Mississippi Supreme Court had before it a claim on a liability insurance policy. The insurer had refused to pay the claim, alleging the policy had been cancelled. Although the insurance company presented proof that they had mailed the cancellation notice, the insured denied that he had ever received it. The insurance policy provided, as does the policy in this case, that the policy could be cancelled by the insurance company by mailing to the insured a notice of cancellation, and that "mailing of notice ... shall be sufficient proof of notice." 168 So.2d 119. The Mississippi Supreme Court, on these facts, held that the insurance policy was effectively cancelled, stating as follows:
Where the policy states the insurer may cancel the policy by mailing the notice of cancellation to the insured's address as stated in the policy, the actual receipt by the insured of the notice is not a condition precedent to a cancellation of the policy by the insured and the mere mailing of the letter containing a notice of cancellation is sufficient to effect a cancellation.
The Court also held that testimony of an insured that he did not receive the notice was not sufficient to even raise a jury issue of non-mailing so long as the proof of mailing is sufficient. 168 So.2d at 120.
In this case, Allstate presented sufficient proof that it mailed a notice of cancellation to Robert A. Carter at his address contained on the declarations page of the policy. Under these facts, the Allstate policy with Carter was effectively cancelled as of October 7, 1983. Moreover, the facts as set forth above clearly indicate that Robert A. Carter did receive the notice of cancellation and therefore Carter cannot prevail on his claim against Allstate since his policy was effectively cancelled prior to the date of the fire. For this reason, the Court finds that a judgment should be awarded to Allstate Insurance Company dismissing the claims of Robert A. Carter.
Vol. I, at 176-77.
The case law cited and discussed by the chancellor in his opinion is current and relevant, and his application of law is correct. This Court therefore affirms the chancellor's decision to deny Carter's claim.

B. Part Two: Whether the Chancellor Properly Concluded That the Bank Was Not Entitled to Recover Against Allstate?

1.
The Bank is listed in Carter's Allstate insurance policy as the mortgagee or "loss payee." Allstate admits that, when it decided to cancel Carter's policy, it failed to send the Bank a copy of the cancellation notice. Appellee's Brief at 2.
Pursuant to statutory and case law, cancellation of a fire insurance policy shall not become effective until at least ten days[1] after the insurer provides the mortgagee (or trustee) with adequate notice. See, e.g., Miss. Code Ann. § 83-13-9 (Supp. 1990); National Security Fire & Cas. Co. v. Mid-State Homes, Inc., 370 So.2d 1351, 1352-55 (Miss. 1979).
Application of the foregoing law to the undisputed facts of this case could lead to the conclusion that Bank is seemingly entitled *71 to recover for the loss of Possum Hollow as a consequence of Allstate's failure to provide it with cancellation notice. See, e.g., United States Fidelity & Guar. Co. v. Arrington, 255 So.2d 652, 655-56 (Miss. 1971) (holding that "insurance companies [are] liable for loss [due to fire if] they had not effectively given notice of cancellation"); National Security Fire & Cas. Co., 370 So.2d at 1354 (same); Highlands Ins. Co. v. Allstate Ins. Co., 688 F.2d 398, 406 (5th Cir.1982) (same). However, principles of law should not always dictate the outcome of a case  particularly when principles of equity dictate a more appropriate outcome and, therefore, must take precedence. This is such a case.

2.
Notwithstanding Allstate's admitted failure to provide the Bank with cancellation notice as required by law and its own policy provisions, the chancellor decided that the Bank was not entitled to recover against Allstate. The chancellor explained:
Metropolitan National Bank ... joined this action as a plaintiff, seeking payment under the Allstate policy in its position as a loss payee.
At the time of the fire on November 23, 1983, Carter owed the Bank $97,206.83 which sum was secured by the subject property. The Bank was listed as a loss payee on the Allstate policy. Allstate admits that it did not mail a copy of the notice of cancellation to the Bank and further admits that it should have mailed the Bank a copy pursuant to its policy and Mississippi law. However, Allstate submits that the Bank's actions following the fire preclude it from any recovery from Allstate and the Court so agrees.

Following cancellation of the Allstate policy, Carter obtained a policy of insurance from Lexington Insurance Company on or about November 18, 1983. Although no copy of this policy was provided to the Bank prior to the fire, Moreno Jones, an officer of the Bank, was advised of the existence of the Lexington policy on the morning of the fire. He was further advised of the cancellation of the Allstate policy at the same time. In December, 1983, Allstate wrote to the Bank, once again advising them of the existence of the Lexington policy and the cancellation of the Allstate policy.
In April, 1984, Lexington paid the sum of $175,000.00 on its policy. The check was made payable to Robert A. Carter, his wife, Juanita, his attorney, William H. Myers, and the Bank. Instead of applying these proceeds to the balance of Carter's loan, the bank entered into a new agreement with Carter and agreed to release the entire $175,000.00 to Carter so long as he would agree to bring all of his loans with the Bank current and to provide the Bank with additional collateral in the form of a $100,000.00 Certificate of Deposit. Moreover, when the Certificate of Deposit came up for renewal in April, 1985, the Bank allowed Carter to reduce it to $62,500.00. Through these acts, the Bank is now estopped from recovery against Allstate.

The union or standard mortgage clause, which is contained in Miss. Code Ann. § 83-13-9 (1972), becomes a part of every fire insurance policy written in the State of Mississippi. Toler [Tolar] v. Banker's Trust Savings and Loan Association, 363 So.2d 732 (Miss. 1978). This clause, which is contained in the Allstate policy, requires that an insurer must give a mortgagee listed in the policy ten days' notice of cancellation and further provides that acts or negligence of the owner or mortgagor will not affect the mortgagee's right to recover under an insurance policy. The purpose of the union or standard mortgage clause is to protect the mortgagee from loss occurring after the mortgagor or owner has caused a lapse in insurance coverage. Highlands Insurance Company v. Allstate Insurance Company, 688 F.2d 398, 406 (5th Cir.1982). In the case sub judice, however, there was no detrimental lapse in insurance coverage. A policy issued by Lexington, which exceeded the coverage originally provided by Allstate, was in force at the time of the fire. Absent the Bank's undertaking of a new agreement with Carter, there would have been no *72 loss whatsoever to the Bank. If the Bank had acted in a reasonably prudent manner, the proceeds from the Lexington policy would have been used to pay off the Carter loan. The Bank was a payee on the Lexington check and easily could have required this. They instead released the funds to Carter. Under Mississippi law, such acts by a mortgagee may relieve an insurance company of its duty to pay a claim even though the insurance company has not complied with Miss. Code Ann. § 83-13-9 (1972). Highlands Insurance Co. v. Allstate Insurance Co., supra, (mortgagee violated other insurance clause in policy).
Furthermore, other Courts have held that a first insurer who has failed to comply with a standard mortgage clause is relieved of liability upon the issuance of other insurance. The Court in Fireman's Fund Insurance Co. v. Appalachian Insurance Co., 572 F. Supp. 799 (E.D.Penn. 1983), aff'd 738 F.2d [422] (3rd Cir.1984), was faced with a situation very similar to this one. Appalachian had issued a policy of insurance on property subject to a mortgage. Its policy contained the standard mortgage clause under which a bank was listed as a loss payee. The owner of the property cancelled the Appalachian policy and subsequently purchased a policy from Fireman's Fund. No notice of cancellation was ever sent to the Bank by Appalachian. The property later burned and Fireman's Fund paid on its policy and then sued Appalachian for its pro rata share of the proceeds. On motions for summary judgment by both sides, the Court held that Fireman's Fund was not entitled to recover from Appalachian:
The purpose of the standard mortgage clause is to protect the interests of the named mortgagee and to assure that the mortgagor or insurer shall not defeat the insurance interests of the mortgagee.
Here, Appalachian has admitted that no notice of cancellation was ever sent to the Banks as mortgagee. Appalachian also concedes that if the Fireman's Fund policy had not been applicable to the loss, the general rule would hold Appalachian liable to the mortgagee in a direct action by the mortgagee. Given the existence of the Fireman's Fund policy, however, Appalachian argues that its obligation to the mortgagee was cancelled as of the date Fireman's Fund assumed coverage, and therefore, Fireman's Fund is not entitled to seek contribution from Appalachian for the loss claimed by the mortgagee. The Court agrees.

The New York standard mortgage clause has been interpreted to operate as an independent contract of insurance between the insurer and the mortgagee. In actuality, however, what has been termed an "independent contract" is more accurately characterized as a right of estoppel which the mortgagee holds against the insurer so that the mortgagee is not subject to forfeiture because of any act or omission of the insurer, unknown to the mortgagee. Existing case law reveals that this estoppel right exists only for the benefit of the mortgagee. The Court has not been presented with any authority which would allow a party other than the one intended to be benefitted from the mortgage clause to assert a claim against an insurer for failure to notify the mortgagee as required by the standard mortgage clause.
In the present case, Fireman's Fund is attempting to pick up the estoppel rights which the bank would have had against Appalachian. This it cannot do. In selling its policy covering the Deer Dale Property and accepting a premium therefor, Fireman's Fund extinguished the Bank's rights against Appalachian. Appalachian was thus the unintended third party beneficiary of the contract between Fireman's Fund and McCoy Lincoln-Mercury (the owner of the property).

Id. at 801-02. (citations omitted) (emphasis added). Applying this law to this case, the bank's rights against Allstate were extinguished when the Lexington *73 policy was issued and the bank can have no recovery against Allstate.
In addition, this is a court of equity which follows the principles of equity. One of the principles of equity which has been followed traditionally in this state is that, as between innocent persons, the one who is in the best position to protect himself should suffer any loss resulting from default of a third party. Western Casualty & Surety Co. v. Honeywell, 380 So.2d 1385 (Miss. 1980); First National Bank of Jackson v. Deposit Guaranty Bank & Trust Co., [247 Miss. 765] 156 So.2d 814 (Miss. 1963); Railway Express Agency v. Bank of Philadelphia, [168 Miss. 279] 150 So. 525 (Miss. 1933). In this case, there can be no doubt that the bank was in the best position to protect itself. It had available to it funds to satisfy Carter's debt to it. Yet it allowed that debt to go unpaid thereby failing to take any action to mitigate its damages. To allow the bank to recover herein would be nothing but a windfall.
Vol. I, at 177-81 (emphasis added). The chancellor's recitation of facts and discussion of law are accurate, and his logic is convincing.
The chancellor's logic is similar to the so-called "substitution theory"  i.e., that procurement of a new property insurance policy could effectuate the cancellation of an existing insurance policy. See, e.g., Strauss v. Dubuque Fire & Marine Ins. Co. 132 Cal. App. 283, 22 P.2d 582 (1933) (holding that the fire insurance policy was effectively cancelled when the insured obtained another fire policy on the same property  notwithstanding the insured's unpersuasive claim that he never intended to cancel the original policy); Wells Petroleum Co. v. Fidelity-Phenix Fire Ins. Co., 121 F. Supp. 739 (Ill.D.C. 1954) (same). The substitution theory is consistent with this Court's dicta in Barry & Brewer v. Wright, 168 Miss. 216, 231-32, 150 So. 186, 189 (1933): "[One purpose of Miss. Code Ann. § 83-13-9 is to] remove[] the temptation to get insurance upon property greater than the interest of the owner of the property insured [and] to prevent having insurance on the same property in separate policies." See also Harrison v. American Motorists Ins. Co., 245 So.2d 577, 578 (Miss. 1971) (In construing § 83-13-9, the Court noted: "This statute has a very laudible [sic] purpose of prohibiting or seeking to prohibit the issuance of excessive coverage on insured property.").
Carter originally insured Possum Hollow through Allstate for $150,000  which presumably represents the equity he had in the property. See, e.g., Plaintiff's Exh. 21. He more than covered the Bank note for which the he procured a "substitute" policy from Lexington in the amount of $175,000. To permit the Bank to recover the policy proceeds from Allstate would essentially mean permitting double recovery. See, e.g., Plaintiff's Exh. 35.
In sum, this Court affirms the chancellor's decision.

C. An Afterword
In the case sub judice, this Court is concerned with the issue of whether an insurer's production of a "certificate of mailing" constitutes conclusive proof that the insured received notice of cancellation. Relevant case law is sparse. In the decades-old case of Employers Mut. Cas. Co. v. Nosser, six of nine justices of the Mississippi Supreme Court concluded that "a provision in an insurance policy which makes the mailing of notice sufficient to cancel the policy, even though such notice is not actually received by the insured, is not invalid as contrary to public policy."[2] 250 *74 Miss. 542, 164 So.2d 426, 432 (Miss. 1964) (citing cases from other jurisdictions).
More recently, in State Farm Ins. Co. v. Gay, 526 So.2d 534, 536 (Miss. 1988), the appellants asked this Court to construe the word "given" in Miss. Code Ann. § 83-11-5 (1972). This section provides:
No notice of cancellation of a policy to which section 83-11-3 applies shall be effective unless mailed or delivered by the insurer to the named insured at least twenty (20) days prior to the effective date of cancellation; provided, however, that where cancellation is for nonpayment of premium at least ten (10) days' notice of cancellation accompanied by the reason therefor shall be given. Unless the reason accompanies or is included in the notice of cancellation, the notice of cancellation shall state or be accompanied by a statement that upon written request of the named insured, mailed or delivered to the insurer not less than fifteen (15) days prior to the effective date of cancellation, the insurer will specify the reason for such cancellation.
This section shall not apply to nonrenewal.[3]Quoted in Gay, 526 So.2d at 536 (Miss. 1988) (emphasis added) ("We decide no issue here except the narrow question presented by the insured... which, in effect, is no more than the meaning of the word `given' in § 83-11-5."). Justice Griffin, writing for the Court, concluded that "proof of mailing satisfies the notice requirement." Id. at 538. Although the opinion was narrowly-drawn, the Court seems to have reached its conclusion by reading § 83-11-5 in conjunction with other sections of Chapter 11, which is entitled "Automobile Insurance." One of these sections is 83-11-9, which the legislature passed in 1970: "Proof of mailing of notice of cancellation, or of intention not to renew, or of reasons for cancellation to the named insured by a certificate of mailing, at the address shown in the policy, shall be sufficient proof."
The insurance industry's general disregard for whether the cancellation notice actually reaches the insured's last known address or is lost or delayed through a miscarriage of mail is outmoded and nonsensical. Such disregard can no longer prevail for the simple reason that it is clearly the antithesis of a notice requirement and its purposes. This is deemed the "antithesis" because, as aptly noted by the Rhode Island Supreme Court a few years ago: "[T]he purpose of a notice of cancellation of an insurance policy is to furnish the insured sufficient time to seek out and obtain coverage elsewhere before the termination of the existing policy." Larocque v. Rhode Island Joint Reinsurance Ass'n, 536 A.2d 529, 531 (R.I. 1988) (holding that the insured must provide actual notice); see also Donarski v. Lardy, 251 Minn. 358, 88 N.W.2d 7, 10-12 (1958) (noting that, if the policy could be cancelled at any time by merely depositing the notice in the mail without regard to whether the notice is actually received, then the purpose of a notice requirement may essentially be nullified); Nosser, 164 So.2d at 448 ("[An insured should be provided a] chance to protect himself by the purchase of other insurance.") (Lee, C.J., dissenting).
Accordingly, this Court believes that clarification of its previous holdings *75 and dicta pertaining to the statutory notice requirement is in order. Contrary to what some may have contended in the past, production of a "certificate of mailing" does not constitute conclusive proof of the insured's actual receipt of the cancellation notice. A certificate of mailing establishes a presumption that the notice reached its destination (the insured's last known address). Cf. Larocque, 536 A.2d at 531-32 ("[actual] receipt may be presumed by proof of an ordinary mailing") (citing Osborne v. Unigard Indemnity Co., 719 S.W.2d 737, 741 (Ky. Ct. App. 1986); Campbell v. Royal Indemnity Co. of N.Y., 256 Pa.Super. 312, 317, 389 A.2d 1139, 1142 (1978)). However, this presumption may be rebutted by the insured who contends that he or she did not actually receive the notice. But mere denial of receipt is insufficient to create a triable issue of fact.[4] In other words, "[p]roof of mailing of notice of cancellation ... shall be sufficient proof of notice"  absent countervailing evidence of sufficient weight to rebut the presumption that it was received. Miss. Code Ann. § 83-11-9 (1972).
In sum, mere mailing of a cancellation notice is not conclusive with regard to whether the insured actually received the notice. Insurers would thus be prudent to take whatever steps are reasonably necessary to ensure that a cancellation notice actually reaches the insured's last known address.

III. CONCLUSION
For the foregoing reasons, this Court affirms the chancellor's decision.
AFFIRMED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and ROBERTSON, SULLIVAN, PITTMAN and BANKS, JJ., concur.
McRAE, J., and HAWKINS, P.J., concur in part, dissent in part by separate written opinion.
McRAE, Justice, concurring in part and dissenting in part:
I concur with the first part of the majority opinion wherein the Court holds that the chancellor did not manifestly err in finding that the Allstate had given Carter proper notice of cancellation. I further concur with the Court's holding in Part C that the mere mailing of a cancellation notice, without more, may not be sufficient to effectuate a cancellation. I am nevertheless concerned by the majority's apparent assumption that an insurer may establish delivery of a cancellation notice to an insured's last known address by procuring from the postal or delivery service a certification that the letter containing the notice will reach its destination. It is presumed by everyone that insurance companies like Allstate go out to the U.S. Postal Service to deposit their mail; however, this is not the case. Allstate and companies similar to it, like State Farm, have their own separate post offices inside their regional offices where they use their own employees to mail documents and handle all postal matters[1] The companies have their own certificate-of-mailing stamps. A certificate of mailing, therefore, is really no more than the mere word of the insurance company that *76 it sent the document in question. Further, a certification stamp of the type used in the instant case is singularly unreliable proof of whether a letter was actually mailed. Exhibit 13 is nothing but an insurance form on which the stamp was placed. The certification does not indicate who mailed the form, does not indicate to whom or where it was sent, and does not indicate whether it was sent by first class mail, certified mail, registered mail, or some other means. The Court should be very cautious in relying on such documentation as proof that a company actually mailed a notice of cancellation to the proper destination.
Regarding the second part of the majority opinion, I cannot agree that the chancellor should be affirmed in his ruling that Metropolitan Bank is not entitled to recovery against Allstate. Both the chancellor and the majority concede that Metropolitan is legally entitled to recovery. However, the majority agrees with the chancellor that recovery should be denied on equitable grounds. First, the majority (and the chancellor) observes:
In the case sub judice ... there was no detrimental lapse in insurance coverage. A policy issued by Lexington, which exceeded the coverage originally provided by Allstate, was in force at the time of the fire. Absent the Bank's undertaking of a new agreement with Carter, there would have been no loss whatsoever to the Bank.
Working from this premise, the majority concludes that Allstate's failure to give notice of cancellation did not implicate the underlying purpose of the standard mortgage clause: to protect the mortgagee from loss occurring after the mortgagor or owner has caused a lapse in insurance coverage. The premise on which this conclusion in based, however, is erroneous. In stating (correctly) that the Lexington policy was in force at the time of the fire, the majority ignores the fact that Metropolitan Bank was not listed as a loss payee on the Lexington policy. Further, the record does not establish that Metropolitan had a right to payment pursuant to Miss. Code Ann. § 83-13-9 since no evidence appears concerning what the Lexington policy actually insured. The majority apparently assumes it insured the building. It could just as easily, however, have pertained to personal property contained in the building since Carter introduced undisputed testimony that the building's contents were worth about $250,000. If so, then Metropolitan would have had no insurable interest in the insured property and thus would not have been entitled to collect under the policy. Southeastern Fidelity Ins. Co. v. Gann, 340 So.2d 429, 434 (Miss. 1976); Aetna Cas. & Sur. Co. v. Davidson, 715 F. Supp. 775 (S.D.Miss. 1989). Even if the Lexington policy did in fact insure the property in which Metropolitan had a security interest, Metropolitan had at best only an equitable lien on the proceeds since it was not listed as a loss payee on the policy. McGory v. Allstate Ins. Co., 527 So.2d 632 (Miss. 1988); Nationwide Mut. Fire Ins. Co. v. Dungan, 634 F. Supp. 674 (S.D.Miss. 1986), aff'd, 818 F.2d 1239 (5th Cir.1987). Even though Metropolitan was listed along with Carter on the Lexington draft, Metropolitan could have refused to turn the proceeds over to Carter by successfully bringing an action to enforce its equitable lien (assuming one existed). See 51 Am.Jur.2d § 66 (1970) ("An equitable lien ... does not divest the debtor of title or possession, and court action is necessary to reach the property or its proceeds"). The facts indicate, therefore, that a detrimental lapse did occur: The bank had a direct, contractual claim to proceeds only under the Allstate policy  the policy that Allstate admittedly cancelled without notifying the bank. Allstate's failure to provide Metropolitan Bank with notice of cancellation, contrary to the majority's rationale, thus violated not only the letter but also the underlying purpose of § 83-13-9's standard mortgage clause.
Secondly, the majority reasons that Allstate was relieved of its liability under the standard mortgage clause upon the issuance of the Lexington policy. The majority relies heavily upon the case of Fireman's Fund Insurance Co. v. Appalachian Insurance Co., 572 F. Supp. 799 (E.D.Penn. 1983). In Fireman's Fund, the *77 United States District Court for the Eastern District of Pennsylvania held that the standard mortgage clause is not so much an independent contract between the insurance company and the insured's mortgagee as it is a right of estoppel in favor of the mortgagee. The Fireman's Fund Court stated that the purpose of this right of estoppel is to prevent forfeiture of the mortgagee's interest because of acts or ommissions of the mortgagor/insured. In accordance with this theory, the court in Fireman's Fund held that the procurement of a subsequent policy from another company in an amount sufficient to protect the mortgagee's interest extinguishes the mortgagee's right of estoppel against the first insurance company.
Fireman's Fund is inapplicable here. First, as has already been stated, there is no showing that Metropolitan Bank had a right to payment under the Lexington policy. If the Lexington policy did not protect Metropolitan's interest as a mortgagee, issuance of the policy could not have extinguished any right on Metropolitan's part to estop Allstate from asserting cancellation as a defense. Secondly, in addition to any right of estoppel, an express, written, independent, and enforceable contract existed between Allstate and Metropolitan Bank as an intended third party beneficiary. The Allstate policy stated the following:
The company reserves the right to cancel this policy at any time as provided by its terms. If so cancelled, this policy shall continue in force for the benefit only of the mortgagee for ten days after notice to the mortgagee of such cancellation and shall then cease. The company shall have the right to cancel this agreement on ten days' notice to the mortgagee.
Allstate inserted the above-quoted language into its policy upon the mandate of Miss. Code Ann. § 83-13-9 (1972), which provides in relevant part:
Each fire insurance policy on buildings taken out . .. by a mortgagor or grantor in a deed of trust shall have attached or shall contain substantially the following mortgagee clause, viz:
Loss or damage, if any, under this policy, shall be payable to (here insert the name of the Party), as ____ mortgagee (or trustee), as ____ interest may appear, and this insurance, as to the interest of the mortgagee (or trustee) only therein, shall not be invalidated by any act or neglect of the mortgagor or owner of the within described property, nor by any foreclosure or other proceedings or notice of sale relating to the property, nor by any change in the title or ownership of the property, nor by the occupation of the premises for purposes more hazardous than are permitted by this policy; ... . This company reserves the right to cancel this policy at any time as provided by its terms, but in such case this policy shall continue in force for the benefit of the mortgagee (or trustee) for ten days after notice of the mortgagee (or trustee) of such cancellation and shall then cease, and this company shall have the right on like notice to cancel this agreement.[2]
(emphasis added).
Carter's procurement of an insurance policy from Lexington did not invalidate or render unenforceable Metropolitan's contractual claim toward Allstate. To get around Metropolitan's contract claim, the majority resorts to the "substitution theory" under which an insured is not permitted to gain a windfall by insuring the same property twice. The majority states:
Carter originally insured Possum Hollow through Allstate for $150,000  which presumably represents his interest in Pollum Hollow when he procured a "substitute" policy from Lexington for $175,000  which he received. To permit the Bank to recover the policy proceeds from Allstate would essentially mean permitting double recovery.
Where the majority gleans its "presumption" that Carter's interest in the property amounted to $150,000 is not apparent, particularly since the parties essentially stipulated *78 that the value of the building alone was at least $400,000.[3] In light of this stipulation, it is obvious that the combined coverage of both policies (assuming arguendo that the Lexington policy even applied to the structure) was less than sufficient to fully insure the building. The "substitution theory", therefore, should have no bearing on this case.[4]
Thirdly, the majority hoists the axiomatic standard of equity which states that as between innocent persons, the one who is in the best position to protect himself should suffer any loss resulting from default of a third party. I first submit that the principle does not apply at all in the context of this case. The two parties upon which the loss may alternatively fall are Metropolitan and Allstate, and Allstate is not an "innocent" party  it admittedly and inexcusably breached its promise to give Metropolitan notice of cancellation of its contract with Carter. Secondly, even if the equitable principle did apply, I simply cannot see how the majority can apply it and conclude that Allstate is entitled to prevail. It is Allstate, not Metropolitan, who was in the best position to protect itself. All the insurance company would have had to do in order to completely insulate itself from the risk of loss would have been simply to mail a notice of cancellation to Metropolitan. The majority contends that Metropolitan could have protected itself by refusing to release the Lexington proceeds to Carter. I repeat, at the risk of being redundant, that nothing in the record indicates that Metropolitan had any enforceable right to retain those proceeds nor any portion thereof.
Moreover, there is another principle in equity that is at least as axiomatic as the one upon which the majority mistakenly relies: "He who comes into equity must come with clean hands." Calcote v. Calcote, 583 So.2d 197, 200 (Miss. 1991). According to Griffith:
No person as a complaining party may have the aid of a court of equity when his conduct with respect to the transaction has been characterized by willful inequity or illegality... . It may be described as such wilful misconduct, inequity or fraud with respect to the immediate transaction as would be condumned and pronounced wrongful by honest and fair-minded men.
V. Griffith, Mississippi Chancery Practice § 42 (G. Warner, rec. ed. 1991).
An inspection of Allstate's "cupped" hands reveals a considerably dark stain. In failing to give notice to Metropolitan that they were cancelling Carter's policy, Allstate violated the clear mandate of § 83-13-9. Allstate cannot say that it was unaware of § 83-13-9's requirement, for the company incorporated the gist of the statute into its own policies. Allstate can state no acceptable reason for its failure to provide the required notice. Accordingly, Allstate should not be entitled to find in equity a cloak for its sin.
The chancellor's finding regarding Allstate's liability to Metropolitan Bank *79 should be reversed and the matter remanded for a full trial.
HAWKINS, P.J., joins this opinion.
NOTES
[1] The legislature extended the ten-day period to thirty days  effective July 1, 1989.
[2] Nosser involved an automobile insurance policy; however, the Court's opinion is written with generic overtones. In other words, Nosser seems to be applicable to all cases involving any type of insurance policy  not only to cases involving automobile insurance policies. This conclusion is supported by the broad language discoverable in the Nosser opinion and the extra-jurisdictional cases relied upon by the majority which involved fire and other types of insurance policies.

In TransAmerica Ins. Co. v. Bank of Mantee, the Court construed Nosser accordingly: "We simply held in that case that when it is established that notice of cancellation was mailed in accordance with the terms of the policy, the failure of the insured to receive the notice would not prevent the cancellation of the insurance policy." 241 So.2d 822, 825 (Miss. 1970).
In Henderson v. United States Fidelity & Guar. Co., the Fifth Circuit Court of Appeals construed both Nosser and TransAmerica Ins. Co. and concluded that: "[T]he [insurance] agent's testimony and a post office certificate are adequate proof of notice." 620 F.2d 530, 535 (5th Cir.1980); but see Black v. Fidelity & Guar. Ins. Co., 582 F.2d 984, 986-88 (5th Cir.1978) (Construing Mississippi case and statutory law, the Fifth Circuit held that "actual receipt of the notice [is] required" before cancellation for nonpayment of a premium may be effectuated.) (citing Miss. Code Ann. § 83-11-5 (1972), and Nelson v. Phoenix of Hartford Ins. Co., 318 So.2d 839, 842 (Miss. 1975)). The Nelson Court held that, where an insurance policy provides that notice must be "given" before cancellation may be effectuated, "the authorities ... all [require] that the actual receipt of the notice by the insured is a condition precedent to the cancellation." 318 So.2d at 842 (citing 64 A.L.R.2d 996, 997, and 43 Am.Jur.2D Insurance § 408).
[3] The Mississippi Legislature amended this section in 1989 by extending the number of days which must transpire before a cancellation notice may become effective. Specifically, the legislature extended the 20-day requirement to 30 days. Compare MISS. CODE ANN. § 83-11-5 (1972), with § 83-11-5 (Supp. 1990).
[4] This Court does not feel compelled at this time to require a showing of conclusive proof that the insured actually received the notice. Such a requirement might arguably be consistent with the notion that insureds have an intangible property interest in an insurance policy and, therefore, are entitled to due process (i.e., actual notice) before the policy may be cancelled. See MISS. CONST. art. 3, § 14 ("No person shall be deprived of life, liberty, or property except by due process of law."). Indeed, the quantum of state action which is involved in the regulation of the insurance industry in Mississippi might, under certain circumstances, trigger due process clause of the state constitution. See Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1174 (Miss. 1990). But an actual-notice requirement could lead to a plethora of unforeseen problems. For example, an unscrupulous insured could prevent effective cancellation by simply ignoring or dodging the notice. See, e.g., Larocque, 536 A.2d at 531; Alexander v. State Farm Mut. Automobile Ins. Co., 148 So.2d 898, 904 (La. Ct. App. 1962).
[1] Having and maintaining their own post offices enables insurance companies to do a tremendous amount of bulk mailing, to receive premiums quickly, and to expeditiously deposit money into interest bearing accounts at various banks.
[2] The same mortgage clause exists today except the grace period has been extended from ten days to thirty days. Miss. Code Ann. § 83-13-9 (Supp. 1990).
[3] Carter testified that the building was valued at $400,000 to $450,000. Allstate did not dispute this figure. Further, the record reflects the following exchange:

BY MR. MYERS: Judge, from what the plaintiff understands, one of the thrusts of the defense is to show that he [Carter] was way over insured with these two policies. And our purpose is to  people like Small is to show that he was not.
BY MR. JERNIGAN: That's news to us, Judge. We have never raised that issue.
[4] Allstate may have a right to partial subrogation against Lexington pursuant to § 83-13-9. See Tolar v. Bankers Trust Sav. & Loan Ass'n, 363 So.2d 732, 738 (Miss. 1978) (second insurer who pays entire claim subrogated to pro rata share from first insurer). The relevant portion of § 83-13-9 states:

In case of any other insurance upon the within described property, this company shall not be liable under this policy for a greater proportion of any loss or damage sustained than the sum hereby insured bears to the whole amount of insurance on said property issued to or held by any party or parties having an insurable interest therein, whether as owner, mortgagee, or otherwise.
Since Allstate chose not to join Lexington in this action, however, this issue is not before the Court, and, in any event, it has no bearing on whether Metropolitan in entitled to payment from Allstate.