BARNES, J.,
for the court:
¶ 1. Michael Hugh Alexander purchased an automobile insurance policy through a local insurance agent, Fred Watson, for his 2003 Chevrolet Malibu on August 29, 2007. The insurance coverage was provided through Granite State Insurance Company (Granite State), but it was essentially a policy through AIG Agency Auto Inc. (AIG).[1] The policy was a six-month policy *192 that Alexander renewed in February 2008, making the policy’s renewal date August 28, 2008. However, the insurance company (specifically, AIG) mailed Alexander a notice dated July 17, 2008, informing him that as of August 28, 2008, his policy would not be renewed since the company no longer serviced full-coverage policies for single vehicles.[2]
¶ 2. On September 23, 2008, Alexander was involved in a vehicular accident with a semi-trailer truck. Alexander submitted his claim, but AIG denied all coverage, as the policy was no longer in effect. Alexander, however, claims he never received any notice of non-renewal until after his accident. Alexander does admit he received notice of non-renewal after the accident— the first notice was postmarked September 24, 2008; the second notice was postmarked October 1, 2008.
¶ 3. On February 26, 2010, Alexander filed a complaint against AIG and other defendants,[3] alleging negligence, breach of contract and fiduciary duty, and fraud in the inducement by the defendants. On May 7, 2010, AIG, 21st Century, and Granite State filed an answer, denying Alexander’s claims. Watson and Career General also filed separate answers to the complaint.
¶ 4. AIG, 21st Century, and Granite State filed a joint motion for summary judgment on March 24, 2011, and Watson and Career General filed a joint motion for summary judgment on April 11, 2011. The circuit court granted the defendants’ motions for summary judgment on June 25, 2012, finding that AIG had provided valid proof of a certificate of mailing of the notice and that Alexander failed to rebut this evidence by demonstrating he had not received timely notice of the non-renewal.
¶ 5. Alexander appeals the circuit court’s grant of summary judgment, claiming that a genuine issue of material fact existed as to whether he received proper notice of the non-renewal and as to whether the agent’s representations to Alexander were negligent. He also argues that AIG was required to issue an amendatory endorsement under the policy. Finding no genuine issue of material fact exists, we affirm the circuit court’s grant of summary judgment.
STANDARD OF REVIEW
¶ 6. A circuit court’s grant of summary judgment is reviewed de novo. Stribling v. Rushing’s Inc., 115 So.3d 103, 104 (¶ 5) (Miss.Ct.App.2013) (citing Byrne v. Wal-Mart Stores Inc., 877 So.2d 462, 464 (¶ 3) (Miss.Ct.App.2003)). Viewing the evidence in the light most favorable to the nonmov-ant, summary judgment is appropriate when “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Id. (citation omitted) (quoting M.R.C.P. 56(c)).
When a motion for summary judgment is made and supported as provided in *193 [Rule 56], an adverse party may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.
M.R.C.P. 56(e).
DISCUSSION
I. Whether the circuit court erred in finding that a bulk mail certificate was conclusive evidence of Alexander’s receipt of notice.
1(7. AIG supported its motion for summary judgment with a United States Postal Service certificate of mailing that showed a document (the notice of non-renewal) was mailed to the listed policy address for Alexander on June 17, 2008.[4] In granting the motion for summary judgment, the circuit court relied on Mississippi Code Annotated section 83-11-9 (Rev. 2011), which states: “Proof of mailing of notice of cancellation, or of intention not to renew, or of reasons for cancellation to the named insured by a certificate of mailing, at the address shown in the policy, shall be sufficient proof of notice.”
¶8. However, the circuit court recognized that this statutory language was not conclusive of the issue. In Carter v. Allstate Indemnity Co., 592 So.2d 66, 67 (Miss.1991), the Mississippi Supreme Court submitted that the production of the certificate of mailing “is not conclusive proof of the insured’s receipt of a cancellation notice; rather, the certificate simply constitutes a presumption that the insured received notice.” This presumption may be rebutted by the insured, “creating] a triable issue of fact.”[5] Id. Nonetheless, the supreme court in Carter concluded that “mere denial of receipt is insufficient to create a triable issue of fact.”[6] Id. at *194 75. Citing Carter, the circuit court in the present case determined that Alexander’s mere assertion he did not receive the notice of non-renewal until after the accident was “not enough to rise to the level of factual disparity-[and does] not satisfy the burden of rebuttal required by the Mississippi Supreme Court[.]”
¶9. Alexander contends that he “produced sufficient evidence to rebut the presumption of receipt of mailing.” Alexander’s mother, Childa Stevens, whose home address was listed on the policy, testified in an affidavit that she did not receive a notice of non-renewal until October 1, 2008.[7] We observe in the record that prior to the non-renewal in August 2008, Stevens had received notices that premium payments were due and that failure to pay would result in cancellation. These notices had the same address on them. The premium payments were paid by Stevens, and Alexander’s coverage was reinstated. The certificates of mailing for these notice of cancellations are also included in the record. Thus, it would appear Stevens received notices and mailings prior to the non-renewal of the policy mailed on June 17, 2008.[8]
¶ 10. Stevens, however, contended that she did not learn of the policy’s non-renewal until after the accident. To support this claim, two notices of non-renewal with postmarked envelopes dated September 24, 2008, and October 1, 2008, respectively, were provided in the record.[9] Moreover, when Stevens called AIG to inquire further about the matter, the insurance company’s automated telephone system stated that coverage was in effect and that no premium payments were owed. Stevens contacted Watson, and transcripts of their recorded conversations reflect that Watson received the same automated information when he contacted AIG — that the policy was still in effect. However, except for the automated recording, no one from AIG ever represented to Stevens or Watson that the policy was in effect after August 28, 2008; nor was there any reliance to Alexander’s detriment based on the automated recording’s erroneous information. The accident had already occurred by the time the recordings were heard. When Stevens spoke to a customer-service representative, she was told that Alexander had no coverage after August 28, 2008. Watson also testified that he never relied on his computer as to whether someone had *195 coverage; he stated he always called the claims center because they have the “up-to-the-minute information on their screen.” Based on this information, we concur with the circuit court’s decision that Alexander failed to provide sufficient evidence to create a triable issue of fact to overcome the presumption of notice. Furthermore, we find no genuine issue of material fact exists regarding whether the policy was still in effect as of the date of the accident.
¶ 11. Accordingly, we find no error in the circuit court’s finding that the certificate of mailing was conclusive proof of receipt of notice.[10]
II. Whether the circuit court committed error in finding AIG’s failure to issue an amendatory endorsement complied with policy provisions and Mississippi law.
¶ 12. Alexander alleges that AIG should have issued an amendatory endorsement to reflect the underwriting change to the policy (regarding the non-coverage of single-vehicle policies). However, since the underwriting change resulted in the non-renewal of the policy, there no longer existed any policy for AIG to amend. As AIG notes in its brief: “If [Alexander were] correct, an insurer would have to issue an endorsement on a policy which was no longer being written, in order to non-renew a policy. Since endorsements are only added to policies, and not issued by themselves, [Alexander’s] entire argument is contrary to established law.”
¶ 18. We agree with AIG’s position. The purpose of a rider or endorsement to an insurance policy “is to make additions to a policy which are actually for the purpose of modifying the general terms of the policy, and therefore, being specific, control the more general terms of the policy.” Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co., 530 F.3d 395, 400 (5th Cir.2008) (citation and quotation marks omitted). “An endorsement thereby ‘controls the policy insofar as it enlarges, modifies or restricts the terms’ of the policy.” Id. (quoting Camden Fire Ins. Ass’n v. New Buena Vista Hotel Co., 199 Miss. 585, 598, 24 So.2d 848, 850 (1946)). Here, there simply was no policy after the non-renewal.
¶ 14. Accordingly, we find Alexander’s argument to be without merit.
III. Whether the circuit court committed error in granting summary judgment.
¶ 15. In his response to the motion for summary judgment, Alexander contended there were several genuine issues of material fact. We have already addressed the issue of whether Alexander was provided timely notice of the non-renewal, finding that Alexander failed to raise a genuine issue of material fact to rebut the presumption that he received notice of the non-renewal.
¶ 16. Alexander also argues that the lienholder on the vehicle, Renasant Bank, failed to receive statutorily required notice.[11] Mississippi Code Annotated section 83-11-7 (Rev.2011) states: “No insurer shall fail to renew a policy unless it shall mail or deliver to the named insured, at the address shown in the policy and to the *196 named creditor loss payee, at least thirty (30) days’ advance notice of its intention not to renew." (Emphasis added).
¶ 17. It is not disputed that the insurance policy did not list a named loss payee/lienholder, and AIG adamantly states that it had no notice that there was a lienholder. In its reply to Alexander’s response to the motion for summary judgment, AIG remarked: “Defendants will acknowledge that the lienholder did not get a notice of renewal, for the reason that no lienholder was provided them by either Alexander or Watson.” The insurance application sent to AIG did not have a lien-holder listed; consequently, there is no named lienholder/loss payee listed on the policy.
¶ 18. When questioned at his deposition, Alexander confessed he did not inform Watson of any lienholder.
Q. Well, do you know if — do you even know if [Renasant Bank] were — did you ever tell Mr. Watson, hey, I’ve got a bank and they may need to be a los[s] payee on this or they may need to be on my policy, too? Anything like that?
A. No.
Although Watson stated that he always inquired as to whether there is a lienholder, he did not recall if there was a lien-holder in this instance. At his deposition, Watson discussed the normal application process in regard to a lienholder:
A. I always ask them if there is a lien and if they say there is, we have to get the information because we have to — the insurance company sends the lienholder a copy of the declaration] page.
Q. If it’s not on there in that preformed application, you can’t send them that, can you?
A. I would ask — I would ask everybody — I have always asked everybody if there is a lien against the vehicle because the company wants to send them information off the declaration] page. And if they say yes, I get Renasant Bank or whoever.
Q. If you would, look at that application and tell me is there anything on that application that would say that you obtained that information?
A. I don’t see it on there.
[[Image here]]
Based on what’s on that application, there is not a place on that application that I see for the lienholder.
Q. AIG would not have that information if you did not place it on that application, would they?
A. Yes, they would, because I ask everybody that I write. And if they say there’s a lienholder on it, I take that information and I supply it to AIG or GuideOne or whoever.
Q. Separate from the application?
A. That’s right, because I would — usually, a fax set-up because the lienholder is going to be calling and asking for it anyway.
Q. Do you have knowledge in this particular case whether or not there was a lienholder?
A. I don’t recall whether there was or not.
[[Image here]]
Q. And it’s my understanding that[,] ... to your knowledge!,] no bank ever called your agency and you to verify insurance coverage on this vehicle?
A. I don’t recall.
Q. And to your knowledge[,] there was no lienholder on this vehicle?
A. I do not recall [Alexander] answering that question [“]yes[”].
*197 (Emphasis added). The application in this instance did not have a question or place to list a lienholder; however, one question did ask whether the vehicle was “title or registered in any name other than the applicant!)]” This question was answered in the negative.
¶ 19. Although AIG denied that Watson was acting as its agent, Watson was responsible for compiling the insurance application and forwarding it to AIG/21st Century for approval and establishment of the policy. Watson also testified that he received a commission for selling the policy. With respect to insurance, Mississippi defines agency liberally, stating that any insurance producer licensed to sell or negotiate insurance in the state of Mississippi is considered an agent. See Miss.Code Ann. § 83-17-1(a) & (f) (Rev.2011). Furthermore, the supreme court has held: “Knowledge acquired by a soliciting agent in the course of his employment in soliciting insurance, preparing and transmitting applications, delivering policies, etc.[,] is ordinarily imputed to the company.” Steinwinder v. Aetna Cas. & Sur. Co., 742 So.2d 1150, 1154 (¶ 17) (Miss.1999) (citing Andrew Jackson Life Ins. Co. v. Williams, 566 So.2d 1172, 1180 (Miss.1990)). However, Watson never said that he was aware that there was a lienholder.
¶ 20. There is only one piece of evidence contained in the record that Watson, as an agent for AIG, may have known Renasant Bank was the lienholder — another copy of the application for the insurance policy that had the lienholder’s name and address handivritten on it. This appears to be the copy sent to the bank, verifying insurance. The bank’s verification of insurance, dated August 29, 2007, is signed by Brenda McCreight, a cashier for Rena-sant Bank. Regarding the application of insurance that listed the lienholder, McCreight testified in an affidavit: “The handwriting depicted on this document is not my handwriting the handwriting of the agency who verified the coverage.” From this somewhat ambiguous statement, we presume Brenda was asserting that the agent, Watson, wrote the name of the lien-holder ofi> the application that was sent to the bank for proof of insurance. Watson, however, has never verified that the handwriting on the application was his. Therefore, there is some evidence, albeit slight, that establishes a factual dispute as to knowledge of a lienholder by Watson and AIG.
¶ 21. Nevertheless, there was clearly no lienholder/loss payee named in the insurance policy, and Alexander has provided no evidence to the contrary. As the insured, Alexander had an obligation to read his policy, although he admits that he did not do so. He could have been alerted to the fact that Renasant Bank was not listed as the lienholder/loss payee in the policy. “[KJnowledge of an insurance policy is imputed to an insured regardless of whether the insured read the policy.” Mladineo v. Schmidt, 52 So.3d 1154, 1161 (¶ 26) (Miss.2010). While there are exceptions to the duty to read a policy, the failure to list the loss payee/lienholder in this policy could have been easily discovered had Alexander (or Stevens) simply given the insurance policy a cursory glance. But see id. at 1162-63 (¶¶ 29-32) (Since an insurance agent’s misrepresentations could not have been ascertained by an actual reading of the policy by the insured, summary judgment was improperly granted.). “[A] contracting party “will not as a general rule be heard to complain of an oral misrepresentation the error of which would have been disclosed by reading the contract.’ ” See id. at 1165 (¶ 42) (quoting Stephens v. Equitable Life Assurance Soc’y of U.S., 850 So.2d 78, 83 (¶ 14) (Miss.2003)).
*198 ¶ 22. Furthermore, Renasant Bank was never a party to the present cause of action. As AIG notes in its brief, the failure to give Renasant Bank notice merely provides the lienholder with a cause of action, not Alexander. We find this argument by AIG to be well-reasoned. While the facts in this case are somewhat unique and afford scant case authority to guide us, there is case law that supports AIG’s claim. The Arizona Court of Appeals has held that the failure to notify a mortgagee or lienholder of the cancellation of a policy does not “negate a proper cancellation as to the insured.” Bryce v. St. Paul Fire & Marine Ins. Co., 162 Ariz. 307, 783 P.2d 246, 247 (Ariz.Ct.App.1989). “Failure to give proper notice to a mortgagee is a defense to cancellation of a policy available to that mortgagee. However, that defense is not available to the insured.” Id. (citing Szymczak v. Midwest Premium Fin. Co., 19 Ohio App.3d 173, 483 N.E.2d 851, 855-56 (1984)). Accordingly, the Arizona appellate court held that there was no coverage at the time of the loss since the insured’s policy interest “was properly cancelled.” Id.; see also Western Exp. Inc. v. Interested Underwriters at Lloyd’s, London, 942 S.W.2d 542, 544 (Tenn.Ct.App.1996) (Although statutory authority “might provide a defense to cancellation for the lienholders[,] ... the failure to notify the lienholders d[oes] not provide a defense to the insured.”); Wisniewski v. State Farm Gen. Ins. Co., 25 Wash.App. 766, 609 P.2d 456, 458 (1980) (A statutory notice of cancellation of a fire-insurance policy mailed to the insureds was effective as to them, even though the insurer did not mail notice of cancellation to the lienholder.).
¶ 23. Consequently, we do not find that this factual issue warrants a reversal of the circuit court’s finding that AIG was entitled to a judgment as a matter of law. We have already determined that Alexander has not sufficiently rebutted the presumption that he received notice. Moreover, we find that the failure to provide Renasant Bank with notice of non-renewal under section 83-11-7 does not provide Alexander with any rights or cause of action regarding the policy coverage. Based on these facts and the applicable law, we cannot find that AIG’s failure to provide Renasant Bank a timely notice of non-renewal created a genuine issue of material fact, precluding summary judgment.
¶ 24. Alexander additionally claims that the agent, Watson, was negligent by failing to provide the requested coverage for the Malibu. Specifically, Alexander contends that Watson was informed to add the Malibu to existing policy coverage for Alexander’s Chevrolet pickup truck. We find no merit to this argument. Regardless of what Watson was told, the insurance-policy application clearly noted that only one vehicle, the Malibu, was being insured. Alexander admits that he never read the application when he signed it; he also confesses that he never read the actual policy. As we have already noted above, “a party has a duty to read an insurance contract[,] and knowledge of the contract’s terms will be imputed to the party even if [he] does not read it.” Frye v. S. Farm Bureau Cas. Ins. Co., 915 So.2d 486, 492 (¶ 22) (Miss.Ct.App.2005) (citing Hutton v. Am. Gen. Life & Acc. Ins. Co., 909 So.2d 87, 96 (¶ 25) (Miss.Ct.App.2005)). Consequently, we find no genuine issue of material fact exists regarding the agent’s representation of the policy’s coverage.
¶ 25. THE JUDGMENT OF THE CIRCUIT COURT OF LEE COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., GRIFFIS, P.J., ISHEE, ROBERTS, CARLTON AND FAIR, JJ., *199 CONCUR. JAMES, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. IRVING, P.J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION. MAXWELL, J., NOT PARTICIPATING.

. The details of Alexander's automobile policy are somewhat complicated. Alexander purchased his AIG policy through a local insurance agent — "Career General Agency Incorporated d/b/a Fred Watson Agency." Watson was a "captive agent” for GuideOne Insurance, through which he wrote standard policies. However, Watson also contracted with other "non-standard” insurance companies to obtain policies for clients who did not qualify for a standard policy (e.g., someone with a bad driving record or DUI). Alexander’s policy was provided through 21st Century Insurance (21st Century), formerly the automobile insurance branch of AIG. According to the record, coverage was underwritten by Granite State. However, for clarity purposes, we will refer to the appellees as a whole as "AIG,” unless otherwise indicated.

. This notice complied with the policy requirements, which stated that if the insurance company decided not to renew the policy for any reason other than nonpayment of premiums, it would mail, within thirty days before the end of the policy period, "notice to the named insured shown on [the] Declarations Page at the last known address shown in [its] records.”

. Alexander's complaint was filed against Career General; AIG, and its successor in interest, 21st Century; Granite State; and Fred Watson, in his capacity as an agent and individually.

.United Postal Service Form 3877, dated June 17, 2008, showed that 5,331 items were mailed on that day. The form listed the policy number, name, address, and effective cancellation date for each item mailed. Listed as item number 02551 was Alexander’s policy number, name, and mailing address. The form also included the policy cancellation date, which was August 28, 2008, and the amount of postage used to mail the letter (forty cents). Another page, signed by a postal employee, certified receipt by the postal service of the bulk mailing that contained the 5,331 items. This official form is typically used to establish proof of mailing. See Hunt v. State Farm Mut. Auto. Ins. Co., 373 Ill.Dec. 792, 994 N.E.2d 561, 571 (Ill.App.Ct.2013) (The Postal Services' “Domestic Mail Manual permits a mailer to use any of three possible forms when requesting a certificate of mailing for three or more pieces presented at one time: the postal provided Form 3877, a privately printed facsimile, or a privately printed Form 3877 that contains the same information as the postal printed form.”); Echavarria v. Nat’l Grange Mut. Ins. Co., 275 Conn. 408, 880 A.2d 882, 888 (2005) (Since "[t]he defendant’s log sheet mirror[ed] the United States Postal Services’ Form 3877 and complie[d] with all of the requirements for certificates of mailing that are listed in the Domestic Mail Manual[,] ... the trial court properly concluded that it was a statutorily correct method.”). Section 83-11-9, however, does not set forth any specifications as to what types of certificates of mailing are sufficient or insufficient.

. The supreme court's holding was that the section 83-11-9 proof of notice shall be sufficient “absent countervailing evidence of sufficient weight to rebut the presumption that it was received.” Carter, 592 So.2d at 75. However, the Carter court stopped short of requiring "a showing of conclusive proof that the insured actually received the notice,” noting that such a requirement “could lead to a plethora of unforeseen problems,” such as purposeful avoidance of receipt of cancellation by the insured. Id. at 75 n. 4.

. In Employers Mutual Casualty Co. v. Nosser, 250 Miss. 542, 168 So.2d 119, 121 (1964), Chief Justice Lee, in a dissenting opinion, *194 posed what this Court finds to be a pertinent and thought-provoking question: "[H]ow pray tell” is the insured "to deny the mailing other than by his sworn testimony that it was not delivered!?]” The Carter court did not answer this question.

.The address on the insurance policy was Alexander’s mother’s home address in Okolo-na, Mississippi. Alexander testified in his deposition that he had not lived at that address since 1998; he lived in Houlka, Mississippi. He also said that his mother was responsible for paying the premiums. In fact, he claimed that Stevens had submitted all the information to Watson for the insurance application. Regarding the application, Alexander testified: "And I just signed it. You know, I didn’t really read it.” He also admitted that he had not read his insurance policy.

. No insurance premium payment was made past July 27, 2008. Alexander testified that his mother had given him his insurance identification card in 2007 and admitted he never received a new card after the renewal date of August 28, 2008. He said it never occurred to him to ask his mother or Watson about receiving an updated insurance card after this date.

. The notices are copies of the June 17, 2008 notice. Receipt of these copies in September and October are not proof that the original notice had never been sent; these latter notices may well have been sent in response to inquiries made by Stevens regarding coverage for the accident.

. In his brief, under Issue I, Alexander also makes an argument regarding notice to the lienholder. However, for ease of discussion, we address this argument in Issue III, which concerns other arguments against the court's granting of summary judgment.

. As of June 22, 2010, Alexander still owed a principal balance of $769.63 on the loan to Renasant Bank for the vehicle in question. The maturity date for the loan was September 5, 2010.